ROGERS, J., delivered the opinion of the court, in which GILMAN, J., joined. GIBBONS, J. (pp. 548-52), delivered a separate dissenting opinion.
OPINION
ROGERS, Circuit Judge.
Felix Booker was convicted of possession of a five-ounce rock of crack cocaine, *537 which he had hidden in his rectum. Police officers, reasonably suspecting that Booker had contraband hidden in his rectum, took Booker to an emergency-room doctor. The doctor, using a procedure that Booker did not consent to, intubated Booker for about an hour, rendered him unconscious for twenty to thirty minutes, and paralyzed him for seven to eight minutes. Using a finger, the doctor found and removed the crack cocaine, and turned it over to the police. Even though the doctor may have acted for entirely medical reasons, the un-consented procedure while Booker was under the control of the police officers must, in the circumstances of this ease, be attributed to the state for Fourth Amendment purposes. The unconsented procedure, moreover, shocks the conscience at least as much as the stomach pumping that the Supreme Court long ago held to violate due process. The evidence resulting from the procedure should accordingly have been excluded, and Booker’s conviction must be reversed.
I.
At approximately 11:50 a.m. on August 12, 2010, Daniel Steakley, a K-9 officer with the Oak Ridge Police Department (“ORPD”), pulled over a car with expired tags. William Booker, the defendant’s brother, drove the car; Felix Booker rode in the front passenger’s seat. While speaking with William Booker, Steakley smelled marijuana. William Booker denied that there were illegal drugs in the car and told Steakley he was free to search the vehicle. Prior to conducting the search, Steakley went to the police cruiser to check William Booker’s driver’s license status and to ascertain the existence of any outstanding warrants with the police dispatcher. As Steakley did so, he noticed Felix Booker “moving around, as if he was attempting to conceal something.” This was not the first encounter between Felix Booker and Steakley. In 2009, Steakley had arrested Booker and recovered thirteen bags of marijuana that Booker hid in his crotch.
After completing the driver’s license and outstanding warrants checks, Steakley utilized his trained drug-sniffing dog. The dog alerted near the front passenger-side door of the car where Felix Booker was seated. Steakley asked Booker to exit the car and patted him down.. During the search, Steakley noticed that Booker “cl[e]nched his butt[ocks] together” when he patted- him in that area, but the pat-down produced, no drugs. However, Steakley did feel two large bulges in Booker’s pockets which turned out to be large amounts of currency. During the search of the front passenger’s seat, Steakley recovered three small plastic bags: one that contained .06- grams of marijuana, another that contained “a green plant-type residue,” and a third covered with a “powder residue.” Steakley also noticed marijuana “ground up into the floor” of the passenger-side seat.
Steakley arrested Felix Booker for felony possession of marijuana, despite being unable to recover enough marijuana to justify such an arrest under Tennessee law. See Tenn.Code Ann. § 39-17-418(b) (defining marijuana possession below 14.175 grams as a misdemeanor offense); § 40-7-118(b)(1) (authorizing citation, but not arrest, when an officer witnesses a misdemeanor). Steakley handcuffed Booker with his hands-behind his back and placed him in the cruiser of. another ORPD officer, Lewis: Ridenour, so that Booker could be taken to the police station. Ridenour left the scene at approximately 12:19 p.m. The officers allowed William Booker to depart without issuing a citation for his expired plates and without trying to recover the marijuana in the floorboard.
*538 ■ Ridenour and Booker arrived at the police station at 12:21 p.m., followed shortly thereafter by Steakley. Steakley placed Booker in an interview room at the station. After Steakley read Booker his Miranda rights, Booker offered to forfeit the money Steakley found in Booker’s pockets in order to be released on citation, while claiming that he earned the cash pouring concrete. Ridenour also noticed that Booker was “fidget[ing] and try[ing] to put his hands in the back of his pants,” prompting Ridenour to move Booker’s handcuffs from his back to his front. When Ridenour stepped out of the interview room for a moment, Booker slammed the door shut and leaned against the door to barricade it. Ridenour, Steakley, and a police sergeant forced themselves into the interview room and wrestled Booker to the ground to regain control over him. The officers searched the room for contraband, patted down Booker a second time, and shook his pants by pulling them up until they were loose and jarring them to dislodge any articles jammed “inside of his pants or in [his] boxers.” The officers did not find anything.
Ridenour next took Booker to the Anderson County Detention Facility in Clinton, Tennessee, arriving at approximately 1:20 p.m. According to Ridenour, Booker fidgeted throughout the drive. Upon arrival, Ridenour discussed Booker’s situation with Jerry Shelton, a sheriffs deputy. The detention facility did not have a policy of strip searching all new detainees, and there is no indication whether Booker was going to be placed in the general population of the facility. However, based on suspicion, Shelton agreed to strip search Booker to determine if he was concealing contraband in his buttocks. Shelton and another officer took Booker into a small room where newly booked inmates typically showered, asked him to remove his clothing, and performed a visual inspection of his body. Shelton asked Booker to bend over and spread his buttocks; when Booker complied, Shelton claimed he could see “a small string protruding from [Booker’s] anus.” Id. at 109. After Shelton asked Booker about the object, Booker moved his hand to cover the area and tried to push the object further into his rectum. This led to another altercation during which Booker had to be restrained by officers. Shelton’s supervisor ordered him to take Booker to a hospital immediately.
At 2:28 p.m., sheriffs deputies transported Booker to Methodist Medical Center in Oak Ridge. Booker was shackled and covered only in a blanket because the officers did not believe there was sufficient time to get him dressed. Shelton rode in the backseat alongside Booker, and said Booker was “squirmish” and “trying to go to the rear end of his body and force something further up into” his rectum. In the meantime, Officer Steakley had traveled separately to the hospital. Before Booker arrived, Steakley told Dr. Michael LaPaglia, the attending physician in the emergency room, that Steakley strongly suspected that Booker had drugs in his rectum.
This was not the first time that officers had brought a suspect to LaPaglia so that he could perform a digital rectal examination, that is, a procedure in which a physician inserts a finger into the patient’s anus to probe the rectum. This was the third time that officers with the Anderson County Sheriffs Department had sought La-Paglia’s assistance with this type of procedure within three years.
At 2:50 p.m., the cruiser arrived at the hospital. Although Booker denied having anything in his rectum, had no physical symptoms, and had normal vital signs, La-Paglia proceeded without waiting. Ac *539 cording to LaPaglia, the possibility of an individual hiding drugs in his rectum raised “a number of concerns” because “[t]he rectum is a part of the body that absorbs drugs very readily,” and at a high dosage, such absorption may be fatal. La-Paglia asserts that this is true even when a person does not initially manifest symptoms of drug absorption, since “the drug could possibly not be absorbed enough at that time for [a physician], to see any signs of the drug.” In the presence of Steakley, Ridenour, Shelton, and. an unnamed officer, LaPaglia “explained to [Booker] what my position was as an emergency physician and that there was suspicion that he had some sort of drug in his rectum and that as an emergency physician I had to assure that he did not, and if he did, that I had to remove it because his life could be in danger.”
Booker — still naked and handcuffed— denied hiding drugs in his rectum and refused to submit to a digital rectal examination. LaPaglia replied that Booker “really did not have a choice because if my suspicion was high enough to think that he had some sort of dangerous substance in his rectum, then it was my duty to get it out.” LaPaglia recalled that the officers did not direct him to do anything to Booker. During the suppression motion hearing, LaPaglia reiterated that his “duty” was medical in nature:
Q.....In a situation where you sus-
pect somebody to have narcotics inside them, can you in such a life-threatening situation take any lack of consent at face value?
A. No.
Q. Why not?
.A. As an emergency physician, if someone’s life is in danger and ... I feel that the person is not aware of the danger, then I have to take control of the situation and do what I need to do to save their life or prevent any harm to them.
LaPaglia warned Booker that if he did not cooperate, LaPaglia would administer muscle relaxants or, if necessary, paralyze Booker in order to perform the rectal examination.
At this point, LaPaglia claims that Booker gave oral consent to a rectal examination. There is nothing in the medical record indicating consent, and none of the other witnesses present (Registered Nurse Tammy Jones, Officer Steakley, Deputy Shelton, and Booker) testified that any consent was' given. Not even LaPaglia contended that Booker consented to the paralyzation procedure.
LaPaglia first performed the rectal examination on Booker without medication. But Booker contracted his anal and rectal muscles while LaPaglia was attempting to examine him, preventing LaPaglia from inserting a finger in Booker’s anus. As LaPaglia said, “If an individual does not want you to enter their rectum, you are not going to.” Id. at 140. LaPaglia or- ■ dered a nurse to inject muscle relaxants into Booker’s left buttock. On the second attempt, Booker remained uncooperative and LaPaglia could not complete the examination, but he could feel a foreign object inside Booker’s rectum, convincing LaPaglia that completion of the rectal examination was imperative. Finally, La-Paglia directed an emergency room nurse, Tammy Jones, to administer a sedative and a paralytic agent to Booker intravenously, and had him intubated to control his breathing. At 4:12 p.m., Booker was intubated. He remained intubated for about an hour, unconscious for twenty to thirty minutes, and paralyzed for seven to eight minutes. While Booker was paralyzed, LaPaglia removed a rock of crack cocaine, greater than five grams, from Booker’s rectum. LaPaglia then turned *540 over the crack rock to Officer Steakley, who took it for evidence.
A federal grand jury indicted Booker on one count of possession with intent to distribute more than five grams of cocaine base, 21 U.S.C. § 841(a)(1), (b)(1)(B). Booker moved to suppress the crack cocaine on Fourth Amendment grounds. He argued that Steakley lacked probable cause to arrest him for marijuana possession and that his post-arrest treatment was unreasonable under the Fourth Amendment. Among other reasons, Booker asserted that the digital rectal examination was an unreasonable invasion of his personal privacy, dignity, and liberty to refuse medical treatment.
After holding an evidentiary hearing on the motion, at which Steakley, Ridenour, Shelton, LaPaglia, Jones, and Booker all testified, the magistrate judge recommended denying Booker’s motion. The magistrate judge found that all aspects of the traffic stop complied with the Fourth Amendment, and concluded that the digital rectal examination was lawful because it was not a “search” under the Fourth Amendment, and even if it was a “search,” LaPaglia and the officers acted reasonably under the circumstances. The district judge adopted the magistrate judge’s recommendations in full. See United States v. Booker, No. 3:10-CR-44, 2010 WL 4884675, at *5-*8 (E.D.Tenn. Nov. 24, 2010).
A jury convicted Booker as charged on February 2, 2011. This appeal followed.
II.
Booker’s Fourth Amendment rights were violated. The officers brought Booker to LaPaglia and stood by while LaPag-lia performed a highly intrusive and dehumanizing procedure on Booker without his consent. On the facts of this case, LaPag-lia’s actions are attributable to the state government and were so unreasonable as to shock the conscience. Because this conduct is sufficiently deliberate and culpable, suppression of the evidence was a proper remedy.
A. State Action
First, the officers’ participation, knowledge, and custody created a sufficiently close nexus to make LaPaglia’s conduct attributable to the police. The Fourth Amendment provides that “[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated.” U.S. Const, amend. IV. This provision is understood to refer to searches by, or made possible by, government officers. It is true that, as the Supreme Court stated in United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Fourth Amendment is “wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.” (internal quotation marks omitted). But that is not the case here.
’ When police officers bring a suspect in custody to a purportedly independent actor, and stand by without interfering while the actor unlawfully batters the subject in a way that the police clearly could not, it can hardly be argued that resulting evidence is admissible. In some circumstances this must be true no matter what the intent of the independent actor. Otherwise, for instance, police could take a suspect to a local town thug who enjoyed beating people up, and let the suspect take a pounding until he gave the location of the loot. This would make no more sense than putting the suspect in a lion’s cage, and saying that the lion, in scratching the suspect, was acting independently because it *541 did not intend to help the police. In these situations, of course, the police could not merely stand by, and-if they did so, their actions would incur Fourth Amendment responsibility. A contrary rule would eviscerate fundamental Fourth Amendment protections.
As the Supreme Court has indicated, whether a private individual’s conduct is imputed to the government “turns on the degree of the Government’s participation in the private party’s activities, a question that can only be resolved ‘in light of all the circumstances.’ ” Skinner v. Ry. Labor Execs.’Ass’n, 489 U.S. 602, 614-15, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). LaPaglia must be treated as a government agent for Fourth Amendment purposes because the suspect was in the physical control of the police, the police knew what LaPaglia was going to do, the police knew that Booker did not consent, arid a reasonable police officer would know that the doctor did not, independent of police direction, have the legal authority to intu-bate and paralyze the suspect without his consent.
The Government does not really contest that Booker was in the physical control of the police, or that the police knew what LaPaglia was going to do.
The district court did suggest that.Booker consented, but nothing in the record reflects that Booker authorized, the performance of the digital rectal examination with paralysis and intubation.[1] Despite the absence of anything indicating consent in the medical record or in the testimony of any other witness who was present during the procedure (Registered Nurse Tammy Jones, Officer Steakley, Deputy Shelton, or Booker), the district court appears to have credited LaPaglia’s testimony that Booker consented. However, the Report and Recommendation’s statement that Booker “agreed to submit to a [digital rectal examination]” does not make any indication of the scope of the consent that Booker gave.
To find that Booker gave informed consent to intubation and the use of paralyzing drugs is not possible based on the record. According to LaPaglia’s testimony, he explained the situation to Booker as follows:
A: I told him that I needed to do a rectal exam. I asked him if I could do so. Initially he said, no. I explained to him that at this point in the Emergency Room he really did not have a choice because if my suspicion was high enough to think that he had some sort of dangerous substance in his rectum, then it was my duty to get it out. And that we could do it a number of different ways. I told him that I would prefer if he cooperated and allow me to do the rectal exam, but if he did not cooperate, then I was going to be forced to administer medications to relax him so that I can do the rectal exam.
I further explained that if that did not Work, then I would have to go to the extreme and actually paralyze him in order to do the rectal exam. I told him that I did not want to go that far. I would rather that he cooperate and we just do the rectal exam and get it over with. At that point he agreed to do the rectal exam.
*542 Q. What happened during this exam?
A. The patient got into the proper position. I prepared to do the rectal exam. He would not allow me to do so. He contracted his anal and rectal muscles so that I could not get my finger inside of his rectum.
Q. This was absent any sort of sedation?
A. Correct.
Q. Then what happened?
A. As I initially told him, if he did not cooperate, I was going to have to give him medication to sedate him in order to do the exam. After the initial attempt to do the exam which failed, I then ordered the nurse to administer ten milligrams of a drug called Midazolam which usually sedates an adult enough to relax all of their musculature so I can do the exam.
Q. Did you in fact sedate the defendant?
A. I did.
Q. What happened after he was sedated?
A. I waited approximately ten to 15 minutes for the medicine to take full effect. I reattempted the rectal exam.
Q. What happened on your reattempt?
A. I was more successful in getting into his rectum at that point because he was sedated and with the tip of my finger I could feel a foreign object-in his rectum. He was still conscious enough to contract his muscles enough so that I could not do a complete rectal exam and remove the object.
Q. So what step did you take next?
A. At that point I was convinced beyond any doubt that there was something in his rectum and that I had to do whatever was necessary to get it out. I went to the next step which I had explained previously to the patient and that was to do paralysis. T administered a combination of medications which paralyze every muscle in the body and I also had to stick a tube down his lungs in order to take over his breathing, basically to control his physiology and keep him alive while he was paralyzed.
(Emphasis added.)
LaPaglia directly testified that consent was not given for the use of the paralyzing drug, Succinylcholine. In response to defense counsel’s question, “Did Mr. Booker consent for you to use [Succinylcholine] in order to remove this object?”, LaPaglia answered “No.”
Viewing the evidence in the light most favorable to the Government, it appears that the most that Booker may have verbally consented to was an undrugged digital rectal examination as a way to avoid being paralyzed by LaPaglia. LaPaglia went beyond even the broadest view of consent and used a paralyzing drug which he admitted Booker, did not consent to. On the entire evidence, Booker did not consent.to a digital rectal examination with paralysis and intubation.
Finally, no reasonable police officer could believe that, without direction from the police, and over the clear refusal to consent by a conscious and competent patient, a doctor could lawfully go ahead and perform such a procedure. Even if La-Paglia was motivatéd by benevolent medical ideals, his actions in paralyzing and intubating Booker and performing a rectal examination without his express or implied consent constitute medical battery. Indeed, under Tennessee law, there is medical battery if “the patient [did not] authorize performance of the procedure.” Blanchard v. Kellum, 975 S.W.2d 522, 524 (Tenn.1998). There is of course a privilege generally recognized in tort law for doctors to deliver medically indicated emer *543 gency care when the patient cannot make the choice pro or con, often because the patient is unconscious. Dan B. Dobbs, The Law of Torts, § 106, at 247 (2000); see also Restatement (Second) of Torts § 892D & cmt. a. Tennessee apparently accepts this exception to the consent requirement. See Ray v. Scheibert, 484 S.W.2d 63, 71 (Tenn.Ct.App.1972). In this case, however, not only was Booker conscious when he was presented to LaPaglia, but Booker’s statements in no way indicate authorization of the intubate-and-paralyze procedure. This distinguishes Booker’s case from a situation in which the police present an unconscious suspect to a hospital. See, e.g., United States v. Black, No. 88-5266, 1988 WL 107375 (6th Cir., Oct, 14,1988).
In short, the police effectively used Dr. LaPaglia as a tool to perform a search on: Booker’s person. In these particular circumstances, Dr. LaPaglia’s medical purposes do not immunize the procedures from Fourth Amendment scrutiny.
The two cases the Government relies on in this connection do not compel a different result. The Government relies upon United States v. Lambert, 771 F.2d 83, 89 (6th Cir.1985), and the Ninth Circuit’s holding in United States v. Attson, 900 F.2d 1427, 1431-33 (9th Cir.1990).
The language relied upon in Lambert is dictum, and relies on a case that is distinguishable. In Lambert, the defendant hired a housekeeper who observed evidence of drug use. Motivated by concerns about the negative effects of drug .use, the housekeeper contacted the FBI, and by her own volition and without suggestion from the FBI, took contraband from Lambert’s home and gave it to the FBI. Lambert, 771 F.2d at 86. We upheld the denial of a suppression motion. In doing so, we recognized the Supreme Court’s holding that the Fourth Amendment “does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official.” Id. at 89 (citing United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); Coolidge, 403 U.S. at 487, 91 S.Ct.-2022). We stated two requirements for finding that a person is acting as a police agent for Fourth Amendment purposes: “First, the police must have instigated, encouraged, or participated in the search. Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts.” Id. (citation omitted). (The first part of this test is met in Booker’s case because the officers’ role in bringing Booker to the hospital and informing La-Paglia of their suspicion amounted to an instigation of the search.) The Government in Booker’s case assumes without conceding that the first requirement is met, but challenges the second. In Lambert, in contrast, our analysis of whether the housekeeper was an agent focused entirely on the first requirement, and conceded that the housekeeper had the intent of assisting the police. The stated requirement that the housekeeper have intended to assist the police was thus entirely unnecessary to our resolution of the Lambert case.
The Lambert dictum does cite, however, United States v. Howard, 752 F.2d 220, 227 (6th Cir.1985), a case in which a house fire created suspicion of insurance fraud. The Howards’ insurance contract permitted the insurance company’s -investigator to enter the premises, and the investigator did so to look for arson. This much is clearly private action, see Stone v. Wingo, 416 F.2d 857, 860-62 (6th Cir.1969), but state police also participated in the investigation. We held that the testimony of the *544 investigator was admissible because even if the government participated, the insurance investigator’s intent was entirely independent of the purposes of a criminal investigation and the insurance investigator was rightfully on the property. See id. at 227-28. This holding was adopted by this court sitting en banc. See United States v. Howard, 770 F.2d 57, 62 (6th Cir.1985) (en banc). The actions of Dr. LaPaglia, in contrast to those of the investigator in Howard, were not colorably lawful because of the clear lack of consent. Moreover, the access to the property was not “presented” to the investigators in the way that Booker was presented to LaPaglia. The Howard case would be more analogous to Booker’s case if the police officers in Howard had had exclusive control of access to the premises and had permitted the private investigator to enter, with the police having objective knowledge that neither the police nor the private investigator had a right to enter the premises. The facts in Howard were far from that. In Howard, the insurance investigator would have investigated the charred remains of the Howards’ house even without police participation.
Indeed, we distinguished Howard on similar grounds in United States v. Hardin, 539 F.3d 404, 417-20 (6th Cir.2008). In that case, we held that for Fourth Amendment purposes an apartment manager became an agent of the government when officers requested that the manager enter an apartment to verify the presence of a suspect. The government argued that upon learning about his tenant’s criminal record, the manager had an independent business motivation for entering the apartment. Id. at 417. We distinguished Howard on the ground that in Howard,
“[t]he insurance company investigator was rightfully on the property to determine the liability of the insurance company” in light of a consent clause in the insurance contract. Howard, 752 F.2d at 227-28. Here, in contrast, Tennessee law provides that a “landlord may enter the dwelling unit without consent of the tenant in case of emergency” and defines emergency as “meaning] a sudden, generally unexpected occurrence or set of circumstances demanding immediate action.” Tenn.Code Ann. § 66-28-403(b). The officers’ mere suspicion that a fugitive felon might be on the premises does not constitute an emergency, and, even if it did, surely the “immediate action” contemplated would riot include the landlord’s unarmed, unescorted entry into the unit where the fugitive was suspected to be.
Id. at 418 (modification in original). Just as the landlord in Hardin could not enter the premises in the absence of an emergency under Tennessee law, Dr. LaPaglia could not intubate and paralyze a conscious and competent Booker except with consent under Tennessee law. Howard does not control Booker’s case.
Finally, the lack of Booker’s consent also distinguishes the Ninth Circuit case upon which the Government relies, United States v. Attson, 900 F.2d 1427 (9th Cir. 1990). In Attson, the suspect consented to removal of blood for medical purposes. See id. at 1429. The Ninth Circuit indeed reasoned that “the fourth amendment will not apply when the private party was acting for a reason that is independent of [an investigative or administrative] governmental purpose.” Id. at 1433. But the court went on to explain the underlying purpose for such- a requirement: “to ascertain the motives underlying governmental conduct that is purportedly subject to the fourth amendment.” Id. The actions of the police in standing by while a suspect in custody is medically treated against his will go directly to the motives underlying governmental conduct in a way that a con *545 sensual taking of blood, or other consented treatment, does not.
This case is the unusual one in which the police effectively use a doctor who is known to conduct unconsented intrusive procedures when suspects in custody are presented by the police. In this context, the doctor’s intent to provide medical care, assuming it is genuine, does not relieve the police of responsibility. A holding of government responsibility does not conflict with our holding in Howard or the Ninth Circuit’s holding in Attson. Focusing too much on the language of those cases and not on the actual holdings would turn them into an engine for circumventing the Fourth Amendment.
Our holding is supported by decisions in other circuits, which require that a private actor’s independent motivation be “legitimate.” Kartorie v. Dunham, 108 Fed.Appx. 694, 699 (3d Cir.2004); United States v. Souza, 223 F.3d 1197, 1202 (10th Cir.2000); United States v. McAllister, 18 F.3d 1412, 1418 (7th Cir.1994); United States v. Walther, 652 F.2d 788, 792 (9th Cir.1981). Thus, even looking at Dr. La-Paglia’s motivation, it was illegitimate in the following sense: A doctor who was solely interested in resolving the “medical emergency” could have given Booker the option of privately using a toilet (although thereby disposing of the evidence). The doctor’s failure to present such a choice showed that he'was acting at least in part to ensure retrieval of the hidden drugs.
Of course the responsibility of the government does not mean that the search results must be suppressed. If police take a suspect in custody to a doctor and require the suspect to be searched by a doctor against his consent, this is permissible if the search is constitutionally reasonable. That is the next question.
B. Reasonableness of the Search
A comparison of this case to Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), shows that the digital rectal examination was unreasonable. In Rochin, three deputy sheriffs forced their way into Rochin’s bedroom based on information that Rochin was selling narcotics. The deputies saw two capsules sitting on his nightstand and asked Rochin whom the capsules belonged to. In response, Rochin grabbed the capsules and swallowed them. The deputies then handcuffed Rochin and took him to the hospital where the police directed a doctor to'force “an emetic solution through a tube into' Rochin’s stomach against his will.” Id. at 166, 72 S.Ct. 205. The stomach pumping.' caused ■ Rochin to vomit up the two capsules, which were found to contain morphine. The Supreme Court held - that Rochin’s conviction for possessing these morphine tablets was so fundamentally unfair as to violate the Due Process Clause. The Court said the deputies’ conduct “shocks the conscience” and was “too close to the rack and-screw to permit of constitutional differentiation.” Id. at 172, 72 S.Ct. 205.
The similarity between the present case and Rochin is apparent. While factual and legal differences exist, what shocked the conscience in Rochin was the use of the forced emetic. Forced paralysis, intu-bation, and digital rectal examination is at least as shocking as stomach pumping. The main legal difference is that Rochin analyzed the practice under the “fundamental fairness” standard- of the Due Process Clause of the Fourteenth Amendment, while Booker bases his challenge on the Fourth Amendment’s prohibition of “unreasonable searches,” which applies to the states-via the Due Process Clause of the Fourteenth Amendment. See Wolf v. *546 Colorado, 338 U.S. 25, 28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). However, this difference is immaterial because investigative conduct that would shock the conscience for purposes of the Due Process Clause is “unreasonable” for purposes of the Fourth Amendment. As the Supreme Court explained in County of Sacramento v. Lewis, 523 U.S. 833, 849 n. 9, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), under modern doctrine, Rochin “would be treated under the Fourth Amendment, albeit with the same result.” In short, the present case cannot be distinguished from Rochin in any meaningful way. Booker was subjected to an unreasonable search in violation of his Fourth Amendment rights.
This conclusion is squarely supported by the Supreme Court’s holding in Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). In Lee, a shopkeeper wounded his assailant during an attempted robbery. Lee was soon found in the neighborhood with a bullet wound to his shoulder and was arrested by the police. The police went to state court to seek an order directing Lee to undergo surgery. The Supreme Court concluded that requiring Lee to undergo surgery involving general anesthesia would be an unreasonable search. See id. at 755-56, 767, 105 S.Ct. 1611.
In reaching the conclusion that the forced surgery would be unconstitutional, the Court found that the following three factors weighed against its substantive reasonableness: (1) “the extent to which the procedure may threaten the safety or health of the individual,” (2) “the extent of intrusion upon the individual’s dignitary interests in personal privacy and bodily integrity,” and (3) “the community’s interest in fairly and accurately determining guilt or innocence.” Id. at 761-62, 105 S.Ct. 1611. These factors, taken together, weigh even more strongly against the reasonableness of the procedure used on Booker.
First, the degree of risk is at least comparable to that in Lee, which involved a general anesthetic but not a paralyzing agent. In Lee, the Court of Appeals had the benefit of evidence — including an x-ray confirming the presence of the bullet— presented at three hearings. Based on this evidence, the Court of Appeals had said the risk to Lee was “minimal.” The Supreme Court noted uncertainty about the medical risk and stated that “the very uncertainty militates against finding the operation to be ‘reasonable.’ ” Id. at 764 & n. 7, 766, 105 S.Ct. 1611. In this case, Booker emphasizes the risk of the paralysis and intubation while the Government emphasizes the routine nature of the procedure in an emergency room. As in Lee, although the medical risks are apparently not extremely high, they are the subject of dispute, and that very uncertainty may weigh against a finding of reasonableness. See id.
Second, in comparison with Lee, the affront to human dignity in this case is compelling. The Court in Lee reasoned:
When conducted with the consent of the patient, surgery requiring general anesthesia is not necessarily demeaning or intrusive. In such a case, the surgeon is carrying out the patient’s own will concerning the patient’s body and the patient’s right to privacy is therefore preserved. In this case, however, the Court of Appeals noted that the Commonwealth proposes to take control of respondent’s body, to “drug this citizen — not yet convicted of a criminal offense — with narcotics and barbiturates into a state of unconsciousness,” and then to search beneath his skin for evidence of a crime. This kind of surgery involves a virtually total divestment of *547 respondent’s ordinary control over surgical probing beneath his skin.
Id. at 765, 105 S.Ct. 1611 (quoting Lee v. Winston, 717 F.2d 888, 901 (4th Cir.1983)). Here, there is not only a probe into a tranquilized subject. Booker, naked and handcuffed, was paralyzed, intubated, and anally probed without his consent. As the Fifth Circuit stated in United States v. Gray, 669 F.3d 556, 565 (5th Cir.2012), this type of intrusion “is .one of the greatest dignitary intrusions that could flow from a medical procedure.” “Such a procedure is degrading to the person being probed— both from his perspective and society’s.” Id., vacated on other grounds, — U.S. -, 133 S.Ct. 151, 184 L.Ed.2d 2 (2012). The affront to personal dignity in Booker’s case is categorically greater than what was not permitted in Lee.
Third, it is true that society’s interest in determining guilt or innocence is “of course of great importance.” Lee, 470 U.S. at 762, 105 S.Ct. 1611. Yet, in Lee, the court found retrieval of the bullet not to be a compelling need because other evidence existed. Id. at 765-66, 105 S.Ct. 1611. This result can be contrasted with another relevant Supreme Court case, Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), which held blood tests used on suspected drunk drivers to be reasonable. Such blood tests are “highly effective ... [especially given the difficulty of proving drunkenness by other means.” Lee, 470 U.S. at.762-63, 105 S.Ct. 1611. The present ease is closer to Lee than to Schmerber in this respect: it is easier for society to prosecute drug possession crimes without the need for medical procedures than it is to prosecute DUI crimes. Furthermore, while reasonableness under the Fourth Amendment is not a least-intrusive-means test, see Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 663, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), it is relevant that far less intrusive means were available to investigate whether Booker was hiding contraband in his rectum. For example, the established policy of the United States Customs and Border Protection is first to attempt an x-ray to confirm the presence of contraband. If further medical examination is necessary, officers consider whether to engage in a monitored bowel movement, and only engage in an involuntary body cavity search after obtaining a court order. See U.S. Customs and Border Patrol, CIS HB 3300-04B, Personal Search Handbook (2004), available at http://foiarr.cbp.gov/ streamingWord.asp?i=7. In this case, La-Paglia testified that he could have done an x-ray. See Supp. Hr’g Tr., 138-39, July 18, 2010. When less intrusive means to investigate were available but not used and when the prosecution has other ways to establish guilt, this diminishes the weight that should be given to using an involuntary and invasive medical procedure to further society’s interest in fairly and accurately determining guilt or innocence.
The factors applied by the Supreme Court in Lee thus compel the conclusion that the search in this case violated the Fourth Amendment. In addition, when there was time to obtain a court order and the police declined to seek one, the suspect’s privacy interests should be given particular solicitude.
Supreme Court precedent thus shows that the unconsented paralysis, intubation, and rectal examination amounted to an unreasonable search, which violated Booker’s Fourth Amendment rights. We of course do not address cases that may be materially different, such as where the police have obtained a court order, where the police were not aware of the extent of the bodily intrusion, where the police were not aware of the lack of necessary consent, where the suspect was not in the control of *548 the police, where the private actor was independently privileged to act, or where other exigencies were at play.
C. The Exclusionary Rule
Because the officers and LaPaglia were sufficiently culpable in violating Booker’s constitutional rights, the exclusionary rule applies notwithstanding the Supreme Court’s ruling in Herring v. United States, 555 U.S. 135, 141, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). That case held that the purpose of the exclusionary rule is to deter officials from violating the Fourth Amendment, and the benefits of deterrence must outweigh the “rule’s costly toll upon truth-seeking and law enforcement objectives.” Id. (quoting Pennsylvania Bd. of Probation & Parole v. Scott, 524 U.S. 357, 364, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)). “To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.... [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.” Id. at 144, 129 S.Ct. 695.
In this case, the rule will obviously deter the behavior of the officers who seek to use willing “independent” doctors to probe in cases where a government-directed investigating doctor could not. Indeed, the evidence that this was the third time in three years that LaPaglia assisted the police suggests recurring behavior. This is not a situation in which the officers relied in good faith on the mistake of a magistrate or judge, see United States v. Leon, 468 U.S. 897, 920-21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), or an erroneous entry in a warrant database, see Herring, 555 U.S. at 146, 129 S.Ct. 695. It is irrelevant whether the officers and LaPaglia acted in subjective good faith. The “ ‘good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal’ in light of ‘all the circumstances.’ ” Herring, 555 U.S. at 145, 129 S.Ct. 695 (quoting Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405). Based on the circumstances of this case, a reasonably well-trained officer and physician would have known that the search was unlawful.
III.
The Government argues neither that the officers would have inevitably discovered the crack cocaine, nor that admission of the evidence was harmless error. Because the paralysis, intubation, and digital rectal examination violated Booker’s Fourth Amendment rights, we have no need to address Booker’s other arguments.[2] We vacate Booker’s conviction and sentence, and remand to the district court for further proceedings consistent with this opinion.

. The Report and Recommendation states "LaPaglia asked the Defendant for his consent to a digital rectal examination ('DRE'). The Defendant initially refused, but then agreed to submit to a DRE.” Report, and & Recommendation, 10. The district court adopted the Report and Recommendation "in its entirety.” Booker, 2010 WL 4884675, at *8.

. Booker's other suppression arguments— that his initial arrest was not supported by probable cause and that the police did not have a clear indication that contraband would be found in his rectum — would provide at most alternative bases for suppression of the crack cocaine. Our vacatur of Booker's conviction and sentence makes it unnecessary to reach his argument that he was sentenced improperly. Should Booker be convicted with admissible evidence, he can be sentenced consistent with the Fair Sentencing Act of 2010, Pub.L. No. 111-220, 124 Stat. 2372. See Dorsey v. United States, - U.S. -, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012).