**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 17a0194n.06

**Case Nos. 16-1605/1623**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 30, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| TOMMY BERNARD BANKS; RAYMOND | ) | DISTRICT OF MICHIGAN |
| DONTE CONLEY | ) | |
| | ) | |
| *Defendants-Appellants*. | ) | |
| | ) | O P I N I O N |

BEFORE: COLE, Chief Judge; STRANCH and DONALD, Circuit Judges.

COLE, Chief Judge. Tommy Banks and Raymond Conley pleaded guilty to a number of gun and drug charges. Banks challenges the denial of his motion to suppress a gun found in his vehicle and drugs found on his person. He also challenges his sentence, arguing that the district court unreasonably converted money found on his person during his arrest to the drugs attributable to him for sentencing. Conley challenges his sentence by arguing that the district court committed legal error by applying a role enhancement to his sentence. Because the district court did not err in denying Banks's motion to suppress or in sentencing Banks and Conley, we affirm.

## I. BACKGROUND

In November 2014, the Holland Department of Public Safety dispatched Officer Matthew Brouwer to investigate a gunshot victim, Tommy Banks. As part of Brouwer's investigation, he searched the vehicle that transported Banks to the hospital, a GMC Suburban ("Suburban"). In the Suburban, he discovered a pistol magazine behind the driver's seat. Brouwer and other officers investigating tentatively concluded that Banks had accidentally shot himself but never found the gun.

On December 27, 2014, around 1:00 a.m., Brouwer was dispatched to investigate a suspicious vehicle on Century Lane in Holland, Michigan. Brouwer testified at the suppression hearing that he saw a parked "GMC Suburban running with the lights on" when he arrived at the scene. (Suppression Hr'g Tr., R. 172, PageID 735.) He then approached the passenger side of the vehicle, smelled marijuana, and recognized the driver as Banks.

After remembering that the gun from the prior investigation was still missing, Brouwer backed away from the vehicle and called for backup. He testified that he also remembered that other officers had mentioned to him that they were investigating Banks for trafficking narcotics.

Officer Reimink, a drug-dog handler, responded to Brouwer's call for backup with his drug dog. Reimink and Brouwer then approached the Suburban together and asked Banks to step out of the driver side. Brouwer talked to Banks and left him with Reimink. Brouwer then approached Conley, who was still in the vehicle, and again smelled marijuana in the vehicle.

Brouwer testified that Conley admitted to having smoked marijuana a couple hours earlier, but Brouwer testified that the marijuana odor seemed much fresher. Brouwer arrested Conley for outstanding arrest warrants. The passenger-side door remained open after Conley exited the vehicle. Brouwer searched Conley but did not find any marijuana or drug

paraphernalia. But he did find a large sum of money on Conley, over a thousand dollars, mostly in twenties. Brouwer testified that he still believed there was marijuana or marijuana paraphernalia in the vehicle.

Brouwer asked Banks for permission to search the Suburban and he refused. Once Banks and Conley exited the Suburban, Reimink used his dog to sniff the exterior of the vehicle. When the dog was at the rear of the vehicle, it alerted, which Reimink testified was an indication that marijuana or an illegal narcotic was inside the vehicle. Reimink continued to allow the dog to lead and the dog jumped into the vehicle through the open passenger-side door. After the dog alerted inside the vehicle, Reimink put the dog away and began a manual search of the vehicle's interior. Reimink found an unloaded firearm in the driver's area. As soon as Reimink told Brouwer he found a gun, Brouwer handcuffed Banks.

The Suburban was moved to another location and searched by other officers after obtaining a search warrant. The officers found a digital scale in the driver-side door compartment. There were no drugs found in the vehicle.

A search of Banks's person yielded a large sum of money, similar to the amount Conley had on him, divided by denomination. The officers took both men to the police station. At the station, other officers advised Brouwer that Banks was known to hide narcotics in his anus. Brouwer thereupon obtained supervisor approval to conduct a strip search. During the strip search, Banks was asked to bend at the waist and grab his buttocks, but he refused. Brouwer noticed that Banks was "clenching and tightening up his buttocks quite a bit." (Suppression Hr'g Tr., R. 172, PageID 743.)

The officers then asked a judge for a warrant to conduct a "cavity search of Banks. (Aff. For Search Warrant, R. 27-1, PageID 68.) The judge signed a warrant, which did not describe

the exact manner for the police to conduct the search. The warrant stated that the "person, place or thing to be searched is the person of Tommy Banks, specifically buttocks cavity, where narcotics are suspected to be hidden." (Search Warrant, R. 27-1, PageID 69.) Brouwer testified that after police received the warrant, the plan was to get Banks to release the drugs voluntarily, but, when he refused, the officers transported him to the hospital. The officers explained the search warrant to the doctor who advised that they have Banks ingest a laxative and take an x-ray. Brouwer then explained the procedure to Banks.

When hospital employees brought in a mobile toilet and large drink container, Banks told Brouwer he wanted to see the doctor. Brouwer asked Detective Daniel DeWitt to get the nurse and doctor and then returned to Banks's room. At this point, Banks walked "over on his own to the portable toilet, sat down on it, and after a few seconds, he released the bag of drugs." (Suppression Hr'g Tr., R. 172, PageID 747.) The bag contained about eight grams of crack cocaine and two grams of heroin.

Brouwer testified that even if Banks had not voluntarily released the drugs at that time the officers would have continued to wait as long as possible with the hope that the drugs would be released naturally.

Banks moved to suppress both the gun found in the Suburban and the drugs found on his person. The district court denied Banks's motion to suppress, finding that the officers lawfully searched the vehicle and Banks's body. On August 12, 2015, a ten-count superseding indictment was filed in the district court against Conley, Banks, Sila Sashay Green, and Terrence Preston.

Banks pleaded guilty to conspiracy to possess with intent to distribute cocaine base (Count 1), being a felon in possession of a firearm (Count 7), possession of heroin and cocaine base with intent to distribute (Count 8), and carrying a firearm during and in relation to drug

trafficking (Count 9).  Banks's Presentence Investigation Report ("PSR") converted the money found on Banks the night of his arrest, $1,073.91, into a drug quantity under U.S.S.G. § 2D1.1.

Banks objected to that conversion prior to sentencing.  At his sentencing hearing, Banks's attorney argued that the money was Banks's earnings from legitimate employment.  The district court was not persuaded because "[Banks] had lost his employment approximately two months [before] the time of the seizure of the money."  (Banks Sentencing Tr., R. 173, PageID 817.)  Further, Banks had told the probation officer that he was selling drugs because he had lost his job and needed the money.  Because "[i]t strain[ed] credulity to believe that this money was not the proceeds from drug trafficking[,] the Court reject[ed] the argument that this money was money from his prior employment" and overruled the objection.  (*Id.* at 817–18.)  The district court sentenced Banks to a total of 130 months of imprisonment.  Banks timely appealed his sentence and the denial of his motion to suppress.

Conley pleaded guilty to being a felon in possession of a firearm (Count 2).  In his plea agreement, he acknowledged that the government could prove that the relevant conduct "that should be used in computing the applicable guideline range is at least 840 grams but less than 2.8 kilograms of cocaine base."  (Conley Plea Agreement, R. 82, PageID 207.)  He also admitted that "Banks, Preston, and Green all set up and conducted transactions" on his behalf.  (*Id.* at 204.)  Conley waived his right to appeal except in a few circumstances, which included if the "District Court incorrectly determined the Sentencing Guidelines range, if Defendant objected at sentencing on that basis."  (*Id.* at 214.)

The PSR characterized Conley as a leader/manager under U.S.S.G. § 3B1.1(c), which led to a two-point increase in his offense level.  Defense counsel filed a written objection to the enhancement prior to sentencing.  The PSR stated that Banks, Conley, Preston, and Green

conspired to distribute cocaine base. The district court found that because Green and Preston had minimal criminal histories, Conley recruited them to the conspiracy. The PSR also stated that, at times, when a confidential informant sought to buy drugs from Conley, Preston or Green would deliver the drugs instead. At the sentencing hearing, defense counsel argued that as a matter of law, Conley could not have played a supervisory role because there was no formal hierarchy in their "loose" conspiracy to sell drugs. (Conley Sentencing Tr., R. 176, PageID 879–80.) The district court overruled the objection and found that Conley's admissions in his plea agreement and the facts in the PSR supported the two-level enhancement. The district court, after granting the government's motion for downward variance, found that Conley's guideline range was 151–188 months and sentenced him to 188 months of imprisonment. Conley timely appealed his sentence.

## II. ANALYSIS

### A. Banks's Motion to Suppress

In reviewing a district court's decision on a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo. *See United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008). A factual finding is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that [a] mistake has been committed." *Id.* (internal quotation marks omitted). We review de novo the district court's finding of probable cause for purposes of the automobile exception. *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002).

#### 1. Denial of Motion to Suppress the Firearm

The Fourth Amendment generally requires that police obtain a warrant before conducting a search. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). One exception to the warrant

requirement involves the search of vehicles. *Id.* For a warrantless search of a vehicle to be constitutional there must be probable cause to search the vehicle. *Id.* In this context, "[t]he test for 'probable cause' is [] whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Cope*, 312 F.3d at 775 (internal citation omitted). "The court's determination of whether probable cause existed at the time of the search is a commonsense, practical question to be judged from the totality-of-the-circumstances." *United States v. Smith*, 510 F.3d 641, 648 (6th Cir. 2007) (citation and internal quotation marks omitted).

In *United States v. Foster*, this court found probable cause to search a vehicle when the officers smelled marijuana coming from the vehicle of an individual whom they had stopped in a lawful *Terry* stop. 376 F.3d 577, 588 (6th Cir. 2004); *see also United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) ("This court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search."); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) (smelling marijuana in the vehicle constituted probable cause to search the vehicle).

Banks argues that the officers lacked probable cause to search the Suburban because the marijuana odor came from Conley, which did not create probable cause to search the vehicle, and the drug dog was unreliable. Before the drug dog began its exterior sniff, Brouwer had identified Banks and knew that he was previously treated for a gun-shot wound, that the gun that caused that wound had not been found, that Banks was under investigation for drug trafficking, that the vehicle smelled of marijuana, and that Conley had admitted to smoking marijuana earlier that day. Further, Brouwer specifically testified that he smelled marijuana emanating from the vehicle rather than just Conley. Based on our precedent, the officers prior to the dog sniff had

probable cause to search the vehicle, so any issues with the reliability of the drug dog do not affect the outcome of the motion to suppress. Therefore, we affirm the district court's denial of the motion to suppress as to the firearm without addressing the reliability of the dog.

### 2. *Denial of Suppression of the Drugs*

The Fourth Amendment states "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The degree of specificity "required is flexible and will vary depending on the crime involved and the types of items sought." *United States v. Ables*, 167 F.3d 1021, 1033 (6th Cir. 1999) (internal quotation marks omitted). A search warrant is sufficiently particular if it is "as specific as the circumstances and the nature of the activity under investigation permit." *Id.* (internal quotation marks omitted).

### a. The Warrant

Banks challenges the search warrant, arguing that it did not comply with the Fourth Amendment's particularity requirement. He argues that the search warrant covered only the space between his buttocks, while the officers sought to search his anus. He also argues that for the warrant to pass constitutional muster, the magistrate judge needed to approve the medical procedures the police planned to use to search Banks.

The district court held that "when read in a common sense manner[,] the officers were asking for authority beyond what they had already done and beyond the mere reviewing of the exterior of Mr. Banks'[s] body." (Suppression Hr'g Tr., R. 172, PageID 801.) The district court added that "[t]he word cavity in the search warrant doesn't mean anything unless it means the search of the interior of Mr. Banks'[s] body." (*Id.*)

We agree with the district court. In this case, the officers were in search of drugs that they could not locate but believed to be inside Banks's body because Banks had previously hidden drugs in his anus. Further, during the strip search, Banks refused to bend at the waist and was visibly clenching his buttocks muscles. The information in the warrant affidavit indicates that the officers were seeking access to more than just the exterior of Banks's body since they had already conducted a strip search. When read in the context of the nature of the activity under investigation and the steps already taken by the officers, the warrant clearly meant to include the interior of Banks's anal cavity and was sufficiently specific.

Banks also argues that the warrant should have included the specific medical procedures the officers planned to use for the search but cites no legal support for the argument that a magistrate judge must approve the method of search. "[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant—subject of course to the general Fourth Amendment protection against unreasonable searches and seizures." *Dalia v. United States*, 441 U.S. 238, 257 (1979) (internal quotation marks and footnote omitted). Consequently, we affirm the district court's finding that the warrant was sufficiently particular and that the police officers did not exceed its scope.

### b. The Reasonableness of the Search

Banks argues that the search was not constitutionally reasonable. This court determines whether a search is constitutionally reasonable by weighing three factors: "(1) the extent to which the procedure may threaten the safety or health of the individual, (2) the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity, and (3) the community's interest in fairly and accurately determining guilt or innocence." *United*

*States v. Booker*, 728 F.3d 535, 546 (6th Cir. 2013) (internal quotation marks omitted). In *Booker*, the court found that a warrantless search of a detainee suspected of hiding cocaine on his person was unconstitutional where the detainee was forced to undergo a digital rectal exam that involved partially paralyzing and intubating him. *Id.* at 539–40.

In this case, there is no evidence that the x-ray or the laxatives would have threatened Banks's safety or health. While the procedure would have been an intrusion on Banks's dignitary interests, the officers had a warrant to search that area of Banks's body, sought guidance from medical professionals on how to safely execute that warrant, and chose a method far less intrusive than the method in *Booker*. Finally, the third factor weighs in favor of the proposed procedure in this case because the officers chose a relatively non-intrusive method to obtain the drugs and had limited other evidence to demonstrate Banks's guilt of drug trafficking. *Cf. id.* at 547 ("When less intrusive means to investigate were available but not used and when the prosecution has other ways to establish guilt, this diminishes the weight that should be given to using an involuntary and invasive medical procedure to further society's interest in fairly and accurately determining guilt or innocence."). In fact, the officers here chose the exact procedures (a warrant, x-ray, and laxative) recommended by Judge Moore as alternatives to the unreasonable procedures used in *Booker*. *Booker v. Paglia*, 617 F. App'x 520, 532 (6th Cir. 2015) (Moore, J., dissenting). Overall, the balance of the factors weighs toward the proposed procedures being constitutionally reasonable.

Even if the proposed procedures were unreasonable, the doctrine of inevitable discovery dictates that the drugs would have been found eventually and so the exclusionary rule would not apply. The inevitable discovery doctrine allows illegally obtained evidence to be admitted if the government can prove by a preponderance of the evidence that it could have obtained the

evidence through a lawful method. *See Nix v. Williams*, 467 U.S. 431, 444 (1984). "Proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995) (citation and internal quotation marks omitted). "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Id.* (internal quotation marks omitted).

In this case, the discovery of the drugs was inevitable because the police would have held Banks until his body naturally released the drugs. Because the gun was found subject to a valid search, the police had enough evidence to detain Banks until his body naturally released the drugs. Banks argues that because there was only one investigation there is no wholly independent source through which the officers would have discovered the drugs. That, however, confuses the inevitable discovery doctrine with the independent source doctrine. In contrast, the independent source doctrine allows "admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix*, 467 U.S. at 443. The requirements for the inevitable discovery doctrine are met in this case, so even if law enforcement's actions exceeded the scope of the warrant or their actions were constitutionally unreasonable, the district court correctly found that the drugs were admissible because the inevitable discovery doctrine applied.

## B. Banks's Sentencing Claim

The "clearly erroneous standard applies to a district court's determination of the quantity of drugs attributable to a defendant for sentencing purposes." *United States v. Mahaffey*, 53 F.3d

128, 131 (6th Cir. 1995). A court's approximation of the amount of drugs involved in a particular case is not clearly erroneous if supported by "competent evidence in the record." *Id.* at 132 (internal quotation marks omitted). The commentary to the sentencing guidelines allows the district court to "approximate the quantity of the controlled substance" where the amount seized does not reflect the scale of the offense. U.S.S.G. 2D1.1, cmt. (n.5).

The district court's finding is not clearly erroneous because the record supports the conclusion that the money found on Banks was a result of drug trafficking. The district court detailed the evidence that supports this finding, including that (1) Banks had lost his job at least two months prior to his arrest, (2) he told a probation officer that he resorted to drug trafficking because he needed money, (3) police found a loaded gun and a digital scale in the Suburban, which are tools of drug traffickers, (4) 8.23 grams of cocaine base and 1.97 grams of heroin were seized from Banks's person, and (5) the cash was split by denomination, which is also consistent with narcotics activity. Competent evidence in the record supports the district court's finding, so we find that it is not clearly erroneous.

### C. Conley's Challenge to his Role Enhancement

We review a district court's factual findings in support of its decision to impose a role enhancement under U.S.S.G. § 3B1.1 for clear error and defer to its legal conclusions. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). "To qualify for an adjustment under [U.S.S.G. § 3B1.1], the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1, cmt. (n.2). The court should consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. (n.4).

Conley does not dispute any of the facts in his plea agreement or PSR but argues they are legally insufficient to find that the enhancement applies. We disagree. The undisputed facts support the district court's decision to impose a role enhancement on Conley. At sentencing, when the district court overruled Conley's objection to the enhancement, it pointed out that neither Green nor Preston had almost any criminal history, and found that Conley recruited them to the drug dealing operation. The PSR also indicates that Conley exercised at least some supervisory capacity over Green and Preston because they would complete drug sales on his behalf. The district court's factual finding that Conley recruited Preston and Green is not clearly erroneous. Also, his recruitment of Green and Preston as well as having at least some supervisory capacity over them provides adequate support for the role enhancement, especially under the deferential standard of review.

## III. CONCLUSION

For the aforementioned reasons, we affirm the judgment of the district court.