FILED
04/29/2021
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE
## November 17, 2020 Session[1]

## STATE OF TENNESSEE v. AARON EVAN PERRY

### Appeal from the Criminal Court for Knox County
#### No. 114134        G. Scott Green, Judge

### No. E2019-02210-CCA-R3-CD

The Defendant, Aaron Evan Perry, was convicted by a jury of three counts of fraudulent use of a credit card of an amount of $1,000 or less, a Class A misdemeanor. See Tenn. Code Ann. §§ 39-14-105(a)(1), -118(b). The trial court imposed an effective sentence of eleven months and twenty-nine days, suspended to time served. On appeal, the Defendant contends that (1) the trial court erred by denying his motion to suppress evidence, arguing that a Belk department store loss prevention manager acted as an agent of the State when he seized the Defendant's identification card and credit card, that the police conducted a pretextual traffic stop of the Defendant to investigate the Belk incident, and that the warrantless search of his vehicle was not justified as a search incident to arrest or inventory search; (2) the evidence is insufficient to support his convictions; (3) the trial court erred by admitting information generated by a hand-held credit card scanner without an adequate foundation; and (4) the trial court erred when it instructed the jury on the elements of illegal possession of a credit card instead of fraudulent use of a credit card. After a thorough review of the record, we conclude that the evidence was insufficient to support the Defendant's convictions and that reversible error occurred when the trial court mistakenly instructed the jury on the elements of illegal possession of a credit card. As a result, we remand the case for the entry of amended judgments reflecting the new conviction offenses of attempted theft, a Class B misdemeanor. In addition, in the interest of judicial economy, we modify the sentence in each count to reflect concurrent sentences of six months and apply to the Defendant's two years of jail credit to satisfy his sentences.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

---

[1] We note that due to technical difficulties, the oral arguments in this case were not recorded.

Eric D. Lutton, District Public Defender[2]; and Tyler M. Caviness, Jonathan Harwell, and Sarah Olesiuk Parker, Assistant Public Defenders, for the appellant, Aaron Evan Perry.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Charme P. Allen, District Attorney General; and William C. Bright and Sean Deitrick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from an October 10, 2017 incident in which the Defendant attempted to purchase gift cards at a Knoxville Belk department store using a falsified credit card. The Knox County Grand Jury subsequently indicted the Defendant for twelve counts of identity theft with the intent to commit theft of property relative to twelve separate victims. Counts 1, 2, 3, 4, and 12 related to customers of Y-12 Federal Credit Union, and Counts 5 through 11 related to customers of Eastman Credit Union.

At trial, Sierra Lopez[3] testified that on October 10, 2017, she was working as a sales manager at Belk women's store in Turkey Creek when she was called to the sales floor by a sales associate regarding a gift card purchase. She agreed that the store contained surveillance cameras, which recorded the relevant events.

The surveillance recording, which did not include audio, showed a man later identified as the Defendant wearing a white jacket and a white baseball cap standing at a cashier station in the lingerie section of Belk. The Defendant took two cards from a display on the counter and spoke to a sales associate, who took the cards, picked up the telephone, and appeared to place a call. After an interval, a woman identified as Ms. Lopez walked to the station, scanned the two cards at the cashier station, and reached across the counter to swipe them on the credit card pin pad. The Defendant handed Ms. Lopez additional cards from his wallet. Two men later identified as loss prevention manager Bill Muenzer and loss prevention associate Derrick Stratton walked behind the counter and stood beside Ms. Lopez; after Ms. Lopez handed Mr. Muenzer the cards the Defendant

---

[2] Mark E. Stephens was the District Public Defender from the time the Public Defender's Office was appointed to represent the Defendant until the conclusion of the Defendant's October 28-30, 2019 trial. On November 1, 2019, Mr. Stephens retired from public service, and Mr. Lutton was appointed as his successor.

[3] At the time of trial, Ms. Lopez's surname was Weldon. Because other witnesses referred to her as Ms. Lopez, for consistency, we will use that name here.

gave her, Mr. Muenzer and the Defendant appeared to converse. The Defendant gesticulated as he spoke, and he pointed at Mr. Muenzer and Ms. Lopez. Mr. Muenzer began to walk away, and the Defendant moved in the opposite direction and continued to gesticulate before turning and walking out of the camera frame.

Ms. Lopez testified that in the recording, she compared the Defendant's driver's license and credit card, entered the gift card amount into the computer, and swiped the gift cards through a card scanner to "load" them. Ms. Lopez stated that Mr. Muenzer retrieved the identification and credit cards from her. Ms. Lopez affirmed that neither she nor the sales associate completed the gift card transaction. Ms. Lopez identified a driver's license and credit card that were similar to the ones the sales associate gave her and which Ms. Lopez provided to Mr. Muenzer. The first card was a Connecticut driver's license issued to a Will Andrews. The second card was a PNC Bank Visa credit card, also issued to Will Andrews.

Bill Muenzer testified that he had worked in loss prevention since 2001 and that on October 10, 2017, around noon, he was working at the Belk women's store when he became aware of a situation he "wanted to attend to." Mr. Muenzer called Ms. Lopez and spoke to her about the situation; some time later, he and Mr. Stratton approached Ms. Lopez, the sales associate, and a customer, whom Mr. Muenzer identified as the Defendant. Mr. Muenzer retrieved an identification card and a credit card from Ms. Lopez; he also stated, though, that the Defendant handed him the cards. Mr. Muenzer told the Defendant that he needed to verify his information before they could complete the gift card purchase. Mr. Muenzer did not remember how the Defendant responded. Mr. Muenzer handed the cards to Mr. Stratton, and the Defendant walked away.

Mr. Muenzer testified that he followed the Defendant to the store's entrance and called Detective Angela Varner with the Knox County Sheriff's Office. Later, Detective Varner called Mr. Muenzer, and Mr. Muenzer traveled to the scene of a traffic stop, where he again saw the Defendant. At the traffic stop, Mr. Muenzer provided Detective Varner with the driver's license and credit card belonging to Will Andrews that the Defendant had presented for the gift card purchases at Belk.

On cross-examination, Mr. Muenzer testified that a customer seeking to purchase a gift card was not generally required to provide identification, a social security number, or an address. Mr. Muenzer agreed that he had no special expertise in "what [went] on . . . behind the scenes" in a credit card transaction. Mr. Muenzer affirmed that he did not know by looking at the cards whether the credit card actually belonged to Will Andrews or whether Will Andrews was a real person.

Knox County Sheriff's Captain Robert Hubbs testified that on October 10, 2017, he worked at the Turkey Creek Precinct station in the retail theft unit. Captain Hubbs stated that Detective Varner left the station after receiving a call related to the Belk women's store. Captain Hubbs left a few minutes later to join Detective Varner at the Belk parking lot. Captain Hubbs saw a man, whom he later identified as the Defendant, rapidly walking "almost in a jog" toward a car in the parking lot.

Captain Hubbs testified that as the Defendant drove away, Captain Hubbs followed him in his unmarked police cruiser. The Defendant accelerated as he drove and ran a red light at a nearby intersection at about 12:30 p.m., at which point Captain Hubbs activated his blue lights and stopped the Defendant. Captain Hubbs noted that the car had an Illinois license plate and that the Defendant moved around in the passenger compartment in a suspicious manner. Captain Hubbs explained that he could see the Defendant's rapidly removing a white jacket and "stuffing things under" the front passenger seat.

Captain Hubbs testified that after calling for backup, he approached the passenger-side window. The Defendant initially refused to roll down the window to speak to Captain Hubbs, but eventually "crack[ed] it" open and handed him a car rental agreement and a driver's license. The Defendant identified himself as Aaron Perry. Captain Hubbs stated that he and the Defendant discussed the red light violation and that he may have asked the Defendant what he was doing at Belk, although he did not remember all of the conversation.

Captain Hubbs identified three Michigan driver's licenses reflecting the name Aaron Perry. The three licenses, which were all taken from the Defendant's wallet, contained the same license number and address, although they contained different issue dates and expiration dates. Two of the licenses expired on May 9, 2016, and the third contained an expiration date of May 9, 2020. Each license reflected a different photograph of the same person. Captain Hubbs did not recall which license the Defendant gave him during the stop.

Captain Hubbs testified that after he returned to his police cruiser to verify the Defendant's driver's license, Detective Varner, a patrol officer, and Mr. Muenzer arrived shortly thereafter. Captain Hubbs identified the Connecticut driver's license and PNC Bank credit card as the ones Mr. Muenzer brought to the location of the traffic stop.

Captain Hubbs testified that the police searched the Defendant's car, his wallet, and a gym bag. Captain Hubbs stated that they found "a number of" credit cards in the gym bag, that five of the cards reflected the Defendant's legal name, and that other cards

–4–

reflected the name Will Andrews. Captain Hubbs said that a laptop computer and "card swiper" were also found inside the car.

Knox County Sheriff's Officer Lee Strzelecki[4] testified that on October 10, 2017, he was working as a patrol officer when he answered a call requesting assistance with a traffic stop on Parkside Drive in Turkey Creek. Officer Strzelecki testified consistently with Captain Hubbs regarding the items found during the traffic stop and the people in attendance. In the Defendant's car, Officer Strzelecki found a wallet containing credit cards; the center console contained additional credit cards. A "card encoder," hotel room key, and white hooded coat were also found in the car.

During a recess in the proceedings, defense counsel objected to Knox County Sheriff's Detective John Huff's anticipated testimony regarding a card scanner machine. Counsel stated that Detective Huff "swiped some things in some kind of machine, [got] some information, [wrote] it down," and was going to testify regarding the information obtained from the machine. The State responded that the machine displayed the number associated with the magnetic strip on a credit card and that the State could "do a sample" of the Defendant's cards to "verify that process." The trial court stated that because the jury had been waiting for some time, it would consider the issue later.

Detective Huff testified for the jury that he worked in the property crimes unit and investigated forgery and fraud cases. Detective Huff also responded to the traffic stop and collected items seized from the Defendant and his car. Detective Huff stated that he examined the credit cards found in the Defendant's car "to verify if the encoded numbers on the magnetic strips on the back of the cards matched the numbers and name on the front of the card."

Detective Huff testified that he took the Defendant's hotel key to the corresponding hotel and that the hotel staff gave him the room number to which the key belonged. During a search of the room, police found an Illinois driver's license with the name Joseph Barber, which contained the Defendant's photograph. In addition, they collected a "company I.D." for "Center Plan Construction Company" and an identification card for "a Mason type group" called "Hope, Faith, and Charity." Both of those cards reflected the name Will Andrews and contained the Defendant's photograph. Detective Huff testified that under one of the mattresses in the hotel room, he found "stacks" of blank credit cards and an "embossing machine," which he explained was used to imprint the numbers and name on the front of a debit or credit card.

---

[4] Officer Strzelecki was a detective at the time of trial.

Detective Huff testified that in his office, he used a scanning device to compare the number encoded on the magnetic strip of a credit card with the number embossed on the card. He stated that the card scanner displayed the number encoded on the magnetic strip.

At this juncture, defense counsel requested a bench conference and lodged the following objection:

> I think it's getting into testimony of this witness that he used some kind of machine to analyze these cards. I don't think that's admissible absent some foundation that he has expertise with the machine and he understands how it works and that it is a reliable method of doing this. I'm not sure that he has any of this knowledge[.]

The State responded that unlike a device like a breathalyzer, "[t]here [were] non-special qualifications [that made] the test result come out right. This [was] . . . just like the card reader that [was] at the grocery store. Except this device d[id not] transmit that data into something else." The State argued that the machine did not have to be calibrated and that Detective Huff could testify about the machine due to his training and experience. The trial court stated that it did not "see a problem" with the testimony and found that it was admissible.

Detective Huff testified that if the number displayed on his card scanner did not match the number on the credit card, he used the first six digits of the displayed number, which was a "bank identification number," to determine to which bank the credit card account belonged. Generally, a bank employee would confirm whether the account owner's name corresponded to the name embossed on the credit card. As a demonstrative exhibit, Detective Huff used the card scanner with one of the credit cards showing the Defendant's name; the number generated by the card scanner matched the number embossed on the card. Detective Huff then used the card scanner with the PNC Bank credit card the Defendant presented inside Belk. The number displayed on the scanner did not match the number shown on the card. Detective Huff read from a list the card numbers associated with three cards found in the Defendant's car, which varied from the numbers obtained by the card scanner.

On cross-examination, Detective Huff testified that he began working in the fraud and forgery department in May 2017; he agreed that he was not present for the incident inside Belk. When asked to explain how the card scanner worked, Detective Huff stated that it read the numbers encoded on a card's magnetic strip and that the card scanner in evidence was the one his office used in this case. He did not know whether the reader was connected to a database, although he noted that the reader was not connected to a computer.

To his knowledge, the card scanner did not read any data contained on a "chip" present in some of the cards. Detective Huff agreed that the card scanner did not generate a "printout" of information and that he did not receive specialized training related to the card scanner, its hardware, or its software. When asked whether the machine had a rate of error, he responded, "Not aware of that." Detective Huff did not know whether any of the alleged victims in the Defendant's case lost money, had fraudulent purchases made to their accounts, or had fraudulent accounts opened in their names. He agreed that he reached out to the victims, as opposed to their having contacted the police to make a complaint.

Detective Huff testified that the Connecticut driver's license belonging to Will Andrews did not "come back" as a valid license; he did not research the address listed on the license. Detective Huff never connected a person named Will Andrews or Anthony Palmer to the Defendant's case, and he agreed that to his knowledge, the Defendant did not pretend to be another existing person named Will Andrews. Detective Huff composed a typed document comparing the embossed and encoded numbers for three cards found in the Defendant's car, as well as the numbers for the card the Defendant presented inside Belk. In addition, by request of the State, Detective Huff hand-wrote the numbers for an additional card found inside the Defendant's car.

Wendy Mioduski testified that she worked for Y-12 Federal Credit Union and that as part of her duties, she was a records custodian who researched fraudulent activity and testified on the bank's behalf in fraud cases. Ms. Mioduski affirmed that she printed records upon the request of the State related to customers Terry Clark, Doug Kibler, John Cowan, and Myrtle McGhee; she also obtained records related to Axis Autobody, a business. Ms. Mioduski stated that she wrote notes on the printouts containing the card number associated with each account. She stated that a "servicer" produced Y-12's credit and debit cards, including programming the card, embossing it, and sending it to the customer. Ms. Mioduski's records for Mr. Clark, Mr. Kibler, and Axis Autobody contained card numbers matching the numbers Detective Huff listed as encoded on cards in the Defendant's car.[5] Ms. Mioduski printed a record for Mr. Cowan, but it did not contain a card number. Ms. Mioduski did not bring a record for Ms. McGhee to court.

On cross-examination, Ms. Mioduski testified that the magnetic strip on a credit card contained the sixteen-digit card number, the account holder's name, the expiration date, and the validation code. She agreed that when a credit card was swiped "through a terminal," the machine would not process the transaction if any piece of information was missing on the card; for example, if the card contained the account number but not the expiration date, a person would be unable to make a purchase. Ms. Mioduski stated that

---

[5] The card presented at Belk was not connected to a Y-12 account holder.

–7–

her bank office contained card scanners that were connected to their computer system, with which she could scan a credit card and print out the electronic record for that account. She denied that anyone asked her to perform this task in connection with the Defendant's case. She agreed that some bank accounts had multiple account holders or were associated with a business. Ms. Mioduski agreed that a credit card number generally did not match the customer's bank account number. Ms. Mioduski testified that if a customer requested a new card because his or her card had been compromised, the bank would issue a new card. She was not aware that any new cards were issued relevant to this case.

Douglas Kibler testified that he was a customer of Y-12 Federal Credit Union and possessed a credit card for his account. He did not remember the card number of the card he had in October 2017; he noted that "this ha[d] happened like three times" and that he had obtained a different card by the time of trial. Mr. Kibler agreed that the records Ms. Mioduski prepared corresponded to his account and that they contained his social security number. Mr. Kibler denied knowing the Defendant or authorizing him or anyone aside from his wife to use his bank account.

On cross-examination, Mr. Kibler testified that the bank alerted him that someone might have used his credit card. He noted that he regularly reviewed his bank statements and would have seen any fraudulent charges. When asked whether fraudulent charges appeared on his account as of October 10, 2017, Mr. Kibler responded that he had previously found fraudulent charges on his account, but due to the passage of time, he did not know the dates of the charges. He agreed that to his knowledge, the Defendant never used his information to open other lines of credit.

Terry Clark testified that in October 2017, he was a customer of Y-12 Federal Credit Union. He stated that he had both a credit and debit card, although he had not memorized either card's number. He affirmed that the bank record of his account contained accurate information and that the credit and debit card numbers listed therein were consistent with his memory of them. Mr. Clark did not know the Defendant or authorize him to use his credit or debit card numbers.

On cross-examination, Mr. Clark testified that to his knowledge, the Defendant never used his card to make purchases, open new lines of credit, or impersonate him at the bank. Mr. Clark stated that although a credit card of his had been "hacked" two years previously and he had disputed that charge, he did not know if that card was the one relevant to this case. He stated that prior to receiving a subpoena in this case, he was never contacted by police and did not know that his credit card number had been compromised.

Lena Burris testified that her husband, Richard Burris, owned Axis Autobody and that she handled the business's finances. She stated that the business had an account at Y-

12 Federal Credit Union, for which she and Mr. Burris each had a debit card with different numbers. Ms. Burris denied that she knew the Defendant or authorized him to use the business's debit card numbers.

On cross-examination, Ms. Burris stated that the business was a limited liability corporation and that the bank contacted her about the debit card number's being in another person's possession. She did not recall when the bank called her, and she noted that the debit card number had been stolen "four or five times." Ms. Burris did not know whether the Defendant ever possessed her personal identifying information. Ms. Burris obtained a new card number after the bank alerted her to the issue.

John Paul Cowan testified that he was a customer of Y-12 Federal Credit Union, and he affirmed that the bank record Ms. Mioduski provided reflected his personal information as of October 2017. He stated that he had a credit and debit card connected to his account. He did not recall the number of either card. Mr. Cowan did not recall whether he noticed an issue with his account or whether the bank contacted him. He noted that the communication occurred about two years previously, but he was unable to provide further details. Mr. Cowan denied giving the Defendant permission to use his card.

On cross-examination, Mr. Cowan agreed that his wife was a joint owner of his account. He denied that he communicated with law enforcement regarding his account. Mr. Cowan did not know if the Defendant ever possessed his social security number, name, or address; similarly, Mr. Cowan did not know whether the Defendant ever used his credit card, opened additional accounts, or opened lines of credit using the information.

Daksha Zaveir testified that she and her husband owned a Days Inn hotel in the Cedar Bluff area of Knoxville and that she handled the business's finances. She identified a hotel record reflecting that a Joseph Barber checked into the hotel on October 5 and checked out on October 7; a "registration card" reflected Mr. Barber's name and signature, as well as a telephone number and an Illinois address. Mr. Barber stayed in Room 214. Ms. Zaveir agreed that the information contained in the Illinois driver's license found in the room matched the information reflected on the hotel record. She stated that if a guest left small items in a room past check-out time, the housekeeper would collect the items, remove them from the room, and note the room number and the date; if a guest left a large quantity of personal items, they would leave the items in the room and attempt to contact the guest. Ms. Zaveir said that if a guest chose to extend his stay, it would sometimes be noted on the guest's original record and sometimes be reflected on a separate record. On cross-examination, Ms. Zaveir stated that Mr. Barber would have left the hotel by 11:00 a.m. on October 7, which was check-out time.

–9–

After the jury had retired for the day, the State conceded that it had presented no proof related to Counts 5, 6, 7, 8, 9, 10, or 11 for the identity theft of the seven victims who were customers of Eastman Credit Union.[6] The trial court granted the Defendant's motion for a judgment of acquittal relative to these counts and denied his motion relative to Counts 1, 2, 3, 4, and 12, the identity theft of Mr. Kibler, Robert Burris d/b/a Axis Autobody, Mr. Clark, and Ms. McGhee, respectively.[7]

The following day, Myrtle McGhee testified that she was a customer of Y-12 Federal Credit Union, that she had a credit or debit card related to her bank account there, and that she never gave anyone permission to take information from her card, place it on another card, and make a purchase at Belk. She said that in late fall 2017, the bank contacted her about a compromised credit card. Ms. McGhee did not recall her credit card number.

The Defendant did not put on any proof and requested that the trial court instruct the jury on two lesser offenses, fraudulent use of a credit card and attempted theft. Before the trial court issued its instructions, it asked the parties whether they had any changes relative to the instructions in each count and the respective lesser offenses. The parties responded negatively each time. The court instructed the jury on the indicted offense of identity theft in Counts 1, 2, 3, 4, and 12, as well as fraudulent use of a credit card and attempted theft.

Relative to the issues on appeal, the trial court instructed the jury as follows:
If you have a reasonable doubt as to the defendant's guilt of identity theft, then your verdict must be not guilty as to this offense and then you shall proceed to determine his guilt or innocence of fraudulent use of a credit card, a lesser included offense of the first count.

---

[6] At a recess on the first day of the State's proof, October 29, the State informed the trial court that during discovery, it had provided the Defendant with a summary of information compiled from Eastman Credit Union bank records relative to the seven victims specified in the indictment in Counts 5 through 11. The parties indicated that the summary consisted of a spreadsheet authored by an unknown person. However, the State did not obtain the supporting bank records until the afternoon of October 28. The State provided the bank records to the Defendant after court was adjourned that afternoon following opening arguments. After substantial argument about whether a discovery violation occurred and whether the summary was admissible, the State chose not to introduce the bank record summary. As a result, it offered no evidence relevant to Counts 5 through 11.

[7] Because defense counsel, the prosecutors, and the trial court anticipated an abbreviated workday on October 31 due to their needing to attend a retirement reception for Mr. Stephens, the trial court discussed Ms. McGhee's anticipated testimony with the parties and made a preliminary denial of the motion for judgment of acquittal relevant to Count 12. It was noted that Ms. McGhee was not available to testify on October 30.

Any person who illegally possesses a credit or debit card is guilty of a crime.

For you to find the [D]efendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) That the [D]efendant took, exercised control or otherwise used a credit or debit card or information from such card; and
(2) That the [D]efendant acted without the consent of the owner or issuer; and
(3) That the [D]efendant acted knowingly.

Based upon this evidence, the jury found the Defendant guilty of fraudulent use of a credit card in Counts 1, 2, 4, and 12, relative to Mr. Kibler, Robert Burris d/b/a Axis Autobody, Mr. Clark, and Ms. McGhee, respectively. The jury acquitted the Defendant in Count 3 relative to Mr. Cowan. The trial court imposed an agreed-upon sentence of eleven months, twenty-nine days in each count, to be served concurrently. The sentence was suspended to time served because the Defendant had been in jail for two years pending trial. At the motion for a new trial hearing, the trial court granted the motion for a judgment of acquittal in Count 12 relative to Ms. McGhee and denied the motion for a new trial. The Defendant timely appealed.

ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred by denying his motion to suppress evidence, arguing that a Belk department store loss prevention manager acted as an agent of the State when he seized the Defendant's identification card and credit card, that the police conducted a pretextual traffic stop of the Defendant to investigate the Belk incident, and that the warrantless search of his vehicle was not justified as a search incident to arrest or inventory search; (2) the evidence is insufficient to support his convictions; (3) the trial court erred by admitting information generated by a hand-held credit card scanner without an adequate foundation; and (4) the trial court erred when it instructed the jury on the elements of illegal possession of a credit card instead of fraudulent use of a credit card.

*I.      Motion to Suppress*

The Defendant contends that the trial court erred by denying his motion to suppress the evidence obtained when Mr. Muenzer seized the Defendant's credit card and driver's license, arguing that Mr. Muenzer was acting as an agent of law enforcement at the time. The Defendant also challenges the traffic stop, arguing that Captain Hubbs stopped the Defendant on the pretextual basis of the red light violation and that Captain Hubbs impermissibly delayed his investigation, failed to investigate the red light violation, and instead focused on the true object of the investigation, the incident at Belk. Finally, the Defendant contends that the search of his rental car was not justified either as a search incident to arrest or an inventory search, arguing that the officers did not have probable cause to believe that evidence of the red light violation or the incident at Belk would be present in the car and that the officers did not ask the Defendant to make arrangements for the car before having it impounded and inventoried.[8] The State responds that Mr. Muenzer was not an agent of law enforcement and that the traffic stop and vehicle search were both permissible.

## A. Factual Background

At the October 1, 2019 suppression hearing, Mr. Muenzer testified on October 9, 2017, he was working at the Belk store in the Knoxville Center Mall when he received an email from Rick Santino, a Belk loss prevention manager in Johnson City, Tennessee. The email detailed an incident in which a person purchased or attempted to purchase several gift cards; Mr. Santino suspected that credit card fraud had occurred and attached several surveillance photographs of the customer. Mr. Muenzer did not recall whether Mr. Santino told him the customer's name.

Later that day, a sales associate reported to Mr. Muenzer that a customer who had already left the building had purchased several large gift cards. Upon examining the store's surveillance recording, Mr. Muenzer concluded that the customer was the same person described in Mr. Santino's email and noted that the man was wearing identical clothing to the man Mr. Santino observed. Mr. Muenzer informed the store manager, and she voided the transaction, thereby voiding the gift cards and limiting Belk's loss. When asked why he did not call the police, Mr. Muenzer stated, "[H]e was gone and I wouldn't have done that anyway." Mr. Muenzer testified that his job entailed protecting Belk's assets and trying to prevent losses by internal or external theft or "anything relating from store processes."

---

[8] The pretrial hearing testimony addressed three motions to suppress. The Defendant only appeals the trial court's determinations relative to Mr. Muenzer's agency relationship with the police and the traffic stop, and we will confine our recitation of the suppression hearing testimony accordingly.

When asked to describe his relationship with the Knox County Sheriff's Office retail task force, Mr. Muenzer stated,

> I personally did not have much of a relationship with them. Although I was working at the Belk store in Knox[ville] Center Mall that day. My main store was a store at Turkey Creek. That's where I was actually based out of. So they have the Sheriff's Office . . . . basically within walking distance of that store.
>
> . . . .
>
> And I actually – I would talk to them – work with them somewhat, but I did not deal with them a lot.

Mr. Muenzer affirmed that although he sometimes interacted with law enforcement, he did not work for them. He denied that the Sheriff's Office paid him for referring cases to them or that he served as a reserve deputy. Mr. Muenzer stated that aside from his sometimes calling the police in his capacity as a loss prevention manager, he had no relationship with the police.

Mr. Muenzer testified that on October 10, 2017, he was working at the Turkey Creek Belk and informed the sales associates to "watch out for" a person purchasing several large Belk gift cards. When a sales associate called him regarding a customer requesting to make such a purchase, Mr. Muenzer called Ms. Lopez and informed her that credit card fraud might be occurring. He instructed her to "handle that situation" and not to complete the purchase until he came to her location. Mr. Muenzer denied that he contacted the police before walking to the register. Mr. Muenzer testified consistently with his trial testimony regarding the surveillance recording of the incident. Mr. Muenzer noted that another loss prevention associate named Derrick Stratton was accompanying him when he walked to the register.

Mr. Muenzer testified that he explained to the Defendant that he "needed to verify certain information with the credit card because . . . we knew he had either made or attempted to purchase several large Belk gift cards . . . traveling the Belk stores." Mr. Muenzer stated that his reasoning was "to protect Belk" and that he wanted to gather more information and "verify the situation either way." Mr. Muenzer denied taking the driver's license and credit card from the Defendant's person, detaining the Defendant, or searching the Defendant. He affirmed that Ms. Lopez gave him the driver's license and credit card.

–13–

Upon examination by the trial court, Mr. Muenzer denied that he was instructed by law enforcement to confiscate the cards. Mr. Muenzer noted that he told the Defendant that he needed to verify the information and that he would "be right back." As Mr. Muenzer walked toward his office, the Defendant exited the building, at which point Mr. Muenzer called Detective Varner. Mr. Muenzer agreed that the Belk men's store was about thirty feet from the Sheriff's Department office.

Mr. Muenzer testified that he told Detective Varner that he had a situation in which he suspected "credit fraud" was occurring, that the suspect was leaving the building, and that Mr. Muenzer had the person's identification and credit card. Mr. Muenzer described the Defendant as being an African-American man wearing a "white pullover" and a white hat. While Mr. Muenzer was on the telephone, he followed the Defendant outside and saw the Defendant enter a vehicle and drive away; Mr. Muenzer described the vehicle to Detective Varner.

After his call with Detective Varner, Mr. Muenzer contacted the credit card company; he was informed that although the card reflected being associated with a PNC Bank account, the account number was associated with Y-12 Federal Credit Union. Detective Varner called Mr. Muenzer after some time and informed him that "the subject" had been stopped for a traffic violation and that the subject had presented a false identification card. Detective Varner asked Mr. Muenzer to bring the driver's license and credit card he possessed to the location of the traffic stop. Mr. Muenzer stated that when he arrived, police officers were speaking to the Defendant and that "[m]any, many gift cards," "multiple IDs," and "stacks of credit cards" had been placed on the hood of the Defendant's vehicle. Mr. Muenzer gave officers the driver's license and credit card, and he relayed to them his conversation with the credit card company.

On cross examination, Mr. Muenzer testified that he was a loss prevention associate at the time of the incident with the Defendant; he characterized his position as the "acting loss prevention manager" and clarified that his supervisor was an "area" loss prevention manager. When asked why he directed the surveillance camera to the Defendant's location, Mr. Muenzer stated that he anticipated needing to record the Defendant due to the Defendant's purchasing large gift cards. Mr. Muenzer denied that he "planned" to approach the Defendant. Mr. Muenzer did not recall whether he instructed the sales associate not to complete the Defendant's transaction, although he noted that he told Ms. Lopez not to do such. Mr. Muenzer agreed that the Defendant had been waiting to complete his transaction for about seven minutes when Ms. Lopez arrived at the cashier station.

Mr. Muenzer testified that to his recollection, he did not call Detective Varner during the seven-minute interval. He elaborated that in spite of the Sheriff's Office's proximity to the Belk women's store, Detective Varner "took . . . a little bit of time to get down there"; he noted that if he had called Detective Varner before speaking to the Defendant, she would "have already been in a position to be at the store." Mr. Muenzer disagreed that he told Detective Varner that he was going to attempt to "retrieve the card." Mr. Muenzer stated that he was "fairly certain" that he only spoke to her after he had the Defendant's cards, although he acknowledged that in the absence of telephone records, he was "speculating off of [his] memory."

Mr. Muenzer testified that the Knox County Retail Task Force focused on instances of retail theft and that he had been aware of the task force for several years prior to the incident in this case. Mr. Muenzer stated that had worked with officers on the task force during his time at Belk; he noted that the Sheriff's Office had a "holiday" task force as well. Mr. Muenzer was not aware of a "special relationship" between Belk and the retail task force, and he did not recall receiving instruction from Belk regarding "working cases" with task force officers. Mr. Muenzer stated that every fourth quarter, all of the retail loss prevention employees would meet with the task force to discuss the times and locations that retail task force officers would patrol during the holiday season.

Mr. Muenzer denied that any member of the retail task force instructed him on how to handle shoplifting incidents. He stated, though, that an email group existed between retailers and the retail task force, which he described as the "alert line," explaining, "[T]hat way if we have any BOLOs, situations like in a real time, we can send an email out and that way other retailers could look out for possible suspects." Mr. Muenzer agreed that employees of various retail establishments and Sheriff's Officers received the emails. He agreed that retail employees and officers shared descriptions of suspects and photographs in the email group; he did not know of any other method by which the retail task force and Belk shared information. Mr. Muenzer did not know whether he had sent any emails about the Defendant using the email group. He stated that the initial email alerting him to the Defendant was sent internally to Belk's regional loss prevention employees.

Mr. Muenzer testified that he was working in loss prevention prior to the retail task force's creation and that the manner in which he handled retail theft incidents did not change after its inception. Mr. Muenzer again described the enhanced support the task force officers gave Belk during the holiday season in November and December.

When asked whether he had worked with Detective Varner previously, Mr. Muenzer stated that it was possible, but that he did not work with "any of them" often. He could not give a number of times or a period of time during which he worked with Detective Varner before the incident in this case. Mr. Muenzer acknowledged that he called

–15–

Detective Varner using his cell phone and that a possibility existed that it was "typical" to contact the retail task force by cell phone. He emphasized again that he "never had much contact with them." Mr. Muenzer did not recall task force officers' having called his cell phone to request that he investigate something. Mr. Muenzer did not remember how he obtained Detective Varner's cell phone number or how he knew to call her in particular. Mr. Muenzer testified that when he called Detective Varner, he explained the situation but did not ask her for instructions about how to proceed.

Mr. Muenzer affirmed that he had visited the Sheriff's Office previously to "take out a warrant on" a person who had stolen from Belk. He denied that the retail task force provided him information about when certain officers were working or that he ever went to the office to "see who was working that day[.]" Mr. Muenzer stated that he was familiar with the names of two officers on the task force, Detective Varner and Brian Cole. Mr. Muenzer did not recall whether Ms. Lopez told him during their telephone call that she had the Defendant's identification card. Mr. Muenzer similarly did not recall whether the Defendant ever asked him to return the cards; he agreed that the Defendant appeared to be agitated in the surveillance recording. Mr. Muenzer stated that he handed the Defendant's cards to Mr. Stratton, and he agreed that he walked away from the cashier station while the Defendant was still standing there. Mr. Muenzer did not know whether he would have given the Defendant his cards had the Defendant asked for them. He acknowledged that he did not ask the Defendant for permission to walk away with his cards.

Mr. Muenzer testified that he was trained using the Belk policy manual, which was received as an exhibit. He agreed that the policy manual contained procedures to be followed if a customer attempted to make a purchase with a stolen or counterfeit form of payment. Mr. Muenzer disagreed that verifying the payment method was outside of the scope of his duties in this regard.

In the event of a question regarding the legitimacy of a payment method, the relevant portion of the policy manual stated, "[The] ringing associate and/or store management should follow the established procedures for verifying the tender in question. Your Loss Prevention Manager and/or Regional Loss Prevention Manager will instruct you further on the subject of investigating and/or prosecuting individuals who present counterfeit or stolen forms of payment." Mr. Muenzer stated that depending on the situation, it was his duty to verify payment as well as the sales associate's and store manager's.

The policy manual also stated that in the event a customer was suspected of attempting a fraudulent return of merchandise, a loss prevention associate did not "have the authority to deny, detain, or devalue forms of payment" and that "[a] member of store management should become involved in processing returns that [were] characterized as

being unusual or suspicious." When asked about this provision, Mr. Muenzer responded that his authority "depend[ed] on whether [they had] proof . . . related to theft."

Mr. Muenzer testified consistently with his trial testimony regarding his following the Defendant to the entrance to Belk after the encounter, calling Detective Varner and describing the Defendant's car as he left the parking lot, and calling the credit card company. He stated that to his recollection, he remained near the door and did not return to the loss prevention office after the Defendant left. He estimated that about fifteen minutes elapsed before Detective Varner asked him to come to the location of the traffic stop, although he acknowledged that the period of time could have been longer. Mr. Muenzer noted that it took some time to be connected to the proper person at the credit card company; he stated that although he had contacted credit card companies previously, it was "a few and far between kind of thing."

The hearing was continued until October 28, 2019. At the second hearing, Captain Hubbs testified consistently with his trial testimony regarding Detective Varner's receiving a call from Mr. Muenzer, Captain Hubbs's responding to the Belk parking lot and seeing the Defendant walking quickly to his car, the circumstances preceding the traffic stop, and the Defendant's movements inside the car as Captain Hubbs approached. Captain Hubbs stated that the Defendant parked his car in the middle of a driveway to one of the nearby shops and that traffic would have been blocked had the car remained there.[9] Captain Hubbs recalled his concern that the Defendant had a weapon or drugs based upon the Defendant's agitation and movement in the car. Captain Hubbs stated that the Defendant was uncooperative and did not wish to exit the car, although he handed Captain Hubbs a driver's license and the car rental agreement through the narrowly-opened passenger-side window. Captain Hubbs asked the Defendant why he would not open the window further, but because the Defendant was "very agitated," Captain Hubbs was "not sure [he] wanted [the Defendant] out of the car at that point." Captain Hubbs said that he informed the Defendant that he had been stopped for running the red light and that when Captain Hubbs checked the Defendant's driver's license, he located no record of it in the national crime information center (NCIC) database. He acknowledged that based upon this result, the validity of the license was unknown. Officer Strzelecki's body camera footage was received as an exhibit; Captain Hubbs confirmed that his unmarked police cruiser did not have a dashboard camera.

In the recording, Officer Strzelecki dismounted his motorcycle, which was parked behind the driver's side of the Defendant's car. Captain Hubbs was visible standing beside the front passenger's side of the car, and the driver's side front window was closed. Detective Varner spoke to Officer Strzelecki as he took off his helmet, at which point audio

---

[9] It was noted that although the business directly connected to the driveway was closed, drivers could access other businesses' parking lots using that driveway.

recording commenced. Detective Varner noted that she had just arrived, and Officer Strzelecki asked whether they should remove the Defendant from the car. Officer Strzelecki ordered the Defendant to exit, but the Defendant did not move; Officer Strzelecki told the Defendant multiple times to "relax" and asked why he was nervous. Detective Varner told Captain Hubbs to unlock the car door, and after a moment, Officer Strzelecki opened the driver's side door. The Defendant was sitting with his hands placed on the steering wheel, and Officer Strzelecki asked him multiple times to exit the car. The Defendant protested, commenting that he was nervous because the officers had entered his car in response to a red light violation, and noting that Captain Hubbs was "clutching" his gun. The Defendant asserted that the officers had violated his rights. Officer Strzelecki asked repeatedly whether the Defendant had just left Belk. The Defendant asked for an attorney, and Officer Strzelecki responded, "You don't get to see a lawyer right now."[10] The Defendant stated that he was "appalled" that an officer had reached inside the window to unlock the car doors and asked to speak to an officer in charge. Officer Strzelecki continued to ask questions about Belk and stated that he was trying to explain to the Defendant why he had been pulled over "besides the red light." As the Defendant continued to object to officers' entering the car for a red light violation, Officer Strzelecki interrupted that the stop was "not just for a red light" and stated that he was investigating an incident at Belk.

In the recording, Officer Strzelecki stated that the Defendant could speak to an officer in charge after exiting the car. At about four minutes, fifteen seconds into the recording, the Defendant exited the car under Officer Strzelecki's control. After handcuffing the Defendant because he was acting "irrational[ly]" and making Officer Strzelecki "nervous," Officer Strzelecki walked the Defendant to the front of a police cruiser, where Captain Hubbs reemerged. Captain Hubbs asked Officer Strzelecki if they were discussing Belk, and Officer Strzelecki answered that he had asked the Defendant about Belk but that the Defendant was not answering his questions. Captain Hubbs addressed the Defendant and explained that he was following the Defendant when the Defendant ran the red light. Captain Hubbs added that the red light violation was "what [he was] writing the ticket for." Captain Hubbs further explained that the Defendant's "rummaging" around in the passenger compartment concerned him and that the police had the right to search the area within the Defendant's arm's reach.[11] The Defendant denied having rummaged or "lunged" in the car and claimed to have been holding food in his lap. The Defendant admitted that he ran the red light, but would not answer questions about whether his name was the one reflected on the driver's license he gave to Captain Hubbs. Detective Varner was audible in the background and commented that the driver's license

---

[10] The trial court excluded from evidence the remainder of the Defendant's statements to police.

[11] Captain Hubbs spoke to the Defendant further, but their conversation was inaudible on the recording.

the Defendant presented at Belk reflected the name Will Andrews. Officer Strzelecki examined the other driver's license and read the Defendant's legal name. Detective Varner stated that the cards from Belk were on their way to the scene. Officer Strzelecki continued to ask the Defendant for his name; Captain Hubbs interjected again that "right now it's a red light ticket" and that the officers "just wante[ed] to talk to [the Defendant] at this point."

Officer Strzelecki read the Defendant his Miranda rights at about nine minutes, fifteen seconds into the recording. About ten and one-half minutes into the recording, Mr. Muenzer was visible handing officers a credit card and driver's license; Mr. Muenzer conveyed his conversation with the credit card company to the officers. Officer Strzelecki informed the Defendant that he was under arrest about eleven minutes into the recording. At about thirteen minutes, thirty seconds into the recording, Officer Strzelecki commented that they could search the Defendant's car now, and he, Detective Varner, and Captain Hubbs leaned into the passenger compartment and began to search it.

Captain Hubbs continued his hearing testimony and stated that a wallet and a cell phone were found on one of the front seats inside the car. After the Defendant exited the car, Captain Hubbs again explained that he had been stopped because he ran a red light. Captain Hubbs noted that the Defendant acknowledged having run the red light. Captain Hubbs stated that the Defendant was "evasive" about his identity and that he was never "definitive" about who he was. Captain Hubbs acknowledged that the Defendant had not been read his Miranda rights at this time. Captain Hubbs identified Mr. Muenzer in the Belk surveillance recording as the person who brought the Defendant's driver's license and credit card to the traffic stop.

Captain Hubbs testified that Mr. Muenzer told them that the credit card's magnetic strip contained a number associated with a Y-12 Federal Credit Union account even though the card was labeled as a PNC Bank card. He agreed that such a discrepancy indicated that the card was fraudulent. Captain Hubbs affirmed that the driver's license from Belk contained the name Will Andrews, whereas the driver's license and rental agreement the Defendant provided to Captain Hubbs contained the name Aaron Perry. Captain Hubbs agreed that at that point in the encounter, he did not know the Defendant's true identity.

Captain Hubbs testified that the Defendant was alone in the car, that he did not ask the officers to make arrangements for someone else to take the car, that the car was a rental, and that the car was blocking traffic. As a result, the car was impounded after the Defendant's arrest. A search of the car at the site of the traffic stop yielded the wallet in the front seat, a gym bag in the back seat, a card scanner that was capable of "cod[ing]" the

–19–

magnetic strip on a credit card, a laptop computer, a cable, and Belk gift cards. No items were found in the car's trunk.

On cross-examination, Captain Hubbs testified that he did not stop the Defendant in the Belk parking lot because he had no confirmation that a fraudulent credit card purchase occurred. He stated that when he initially approached the Defendant, the Defendant was agitated and told Captain Hubbs that he would not exit the car. Captain Hubbs acknowledged that one factor leading to Captain Hubbs's concern for his safety was that the Defendant had possibly committed felony credit card fraud, but he noted that the Defendant was also moving around the passenger compartment to a suspicious degree.

Captain Hubbs testified that when he initially approached the Defendant's car, he "may have" asked the Defendant where he was coming from and "what he was doing at Belk." Captain Hubbs stated that he did not wish to "have a lot of engagement" with the Defendant until backup arrived. Captain Hubbs affirmed that checking a driver's license with the NCIC database was the only method he had of verifying a driver's license.

Captain Hubbs testified that he ran the Defendant's driver's license before the other officers arrived, although he acknowledged his preliminary hearing testimony that he had not run the license at the time Mr. Muenzer arrived at the scene. Captain Hubbs clarified that he ran the Defendant's information while waiting for backup. When asked whether he began paperwork for a traffic citation related to the Defendant's running the red light, Captain Hubbs responded negatively and said that he did not have a "ticket book" and was waiting for the other officers to arrive. Captain Hubbs affirmed that he was also investigating the Defendant for "something . . . suspicious" at Belk. He stated that he "may have" mentioned Belk to the Defendant, although he did not recall the details of their conversation.

Captain Hubbs testified that after Detective Varner instructed him to unlock the Defendant's car door, he reached through the passenger-side window and pressed the unlock button inside the car. Captain Hubbs noted that the Defendant was acting "erratic" and that the officers were preoccupied with trying to secure the Defendant. Captain Hubbs acknowledged that Officer Strzelecki questioned the Defendant repeatedly about what happened at Belk. Captain Hubbs agreed that after a certain point, the Defendant stopped conversing with the officers.

Captain Hubbs testified that he did not discuss with the Defendant making arrangements for someone to take custody of the rental car. He estimated that in a usual case of a traffic stop based upon a person's running a red light, it took between ten and fifteen minutes to issue a ticket and release the person.

–20–

The trial court found that Mr. Muenzer was not acting as an agent for law enforcement at the time he took the Defendant's credit card and driver's license. The court found relative to the initial portion of the traffic stop that Detective Varner conveyed a description of the Defendant to law enforcement, that Captain Hubbs saw the Defendant walking rapidly to his car and leaving the parking lot, and that Captain Hubbs's checking the Defendant's identification was part of a valid inquiry into the red light violation. The court found relative to the search of the Defendant's car that the search was incident to an arrest and "clearly . . . appropriate" because the car was "a natural repository for items associated with . . . someone who ha[d] . . . been engaged in credit card fraud, theft, or identity theft." The court noted that the search was also permissible as an inventory search and that the search did not occur until after Mr. Muenzer had brought the Defendant's false cards to the scene.

## B. Analysis

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Likewise, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial court, and this court will not reverse the trial court's factual findings unless the evidence preponderates against them. Id. (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). The evidence is to be viewed in the light most favorable to the prevailing party on a motion to suppress with all reasonable and legitimate inferences that may be drawn by the evidence. State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000). However, our review of the application of the law to the facts is de novo. State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. Any warrantless search or seizure is presumed to be unreasonable and requires the State to prove by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. State v. Simpson, 968, S.W.2d 776, 780 (Tenn. 1998). Two types of police-citizen encounters are considered seizures for constitutional analysis purposes: "(1) the full-scale arrest, which must be supported by probable cause; [and] (2) the brief investigatory detention, which must be supported by reasonable suspicion of wrong-doing[.]" State v. Day, 263 S.W.3d 891, 901 (Tenn. 2008) (citations omitted).

–21–

### i. Mr. Muenzer's Agency Status

Although the Fourth Amendment applies only to government action, "a search by a private individual may transgress the protections of the Fourth and Fourteenth Amendments when an individual acts as an agent or instrument of the state." State v. Burroughs, 926 S.W.2d 243, 245 (Tenn. 1996). In order to determine whether a person acted as an agent of the state during a search or seizure, we must examine whether the person had a "legitimate independent motivation" aside from assisting the government. State v. Sanders, 452 S.W.3d 300, 308 (citing Coolidge v. New Hampshire, 403 U.S. 443, 489 (1971)). The "critical factors" of the legitimate independent motivation test are "(1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search." Id. (citing Burroughs, 926 S.W.2d at 246 (quoting United States v. Walther, 652 F.2d 788, 792 (9th Cir. 1981)).

Relative to the first prong of the test, our supreme court held in State v. Johnson, 569 S.W.2d 808, 810-11 (Tenn. 1978), that an airline customer service agent did not act as an agent of the state when he inspected a suitcase, found drugs, and only then called the police; the court noted that the police had not been involved before the object of the search was "completely accomplished." (quoting Lustig v. United States, 338 U.S. 74 (1949)). In contrast, if a government agent gives explicit or tacit approval to a search while the search is ongoing, the government becomes "party to the search." United States v. Knoll, 16 F.3d 1313, 1319-20 (2nd Cir. 1994) (noting that a federal prosecutor "tacitly suggested and condoned further searching" of materials obtained during a burglary by telling the informant who arranged the burglary that the prosecutor was disappointed with the evidence the informant provided); see United States v. Booker, 728 F.3d 535, 540-41 (6th Cir. 2013) (holding that an emergency room doctor violated the defendant's Fourth Amendment rights and acted as an agent of the state by performing rectal examinations without the defendant's consent or an explicit request from the police to do such; the doctor had performed similar searches for the police in the past, the defendant was in the police's physical control, "the police knew what [the doctor] was going to do, the police knew that [the defendant] did not consent, and a reasonable police officer would know that the doctor did not, independent of police direction, have the legal authority to intubate and paralyze the [defendant] without his consent"); Walther, 652 F.2d at 792 (holding that a baggage handler acted as agent of the state notwithstanding the state's lack of knowledge of that particular search; the baggage handler had been monetarily rewarded previously for turning over luggage containing drugs to federal agents, he reasonably expected to receive such a reward in this instance, federal agents had encouraged him to engage in that type of search, and the federal agents "had knowledge of a particular pattern of search activity . . . and had acquiesced in such activity").

The second prong of the test "requires an examination of whether the private party who conducted the contested search acted 'for a reason independent of . . . a governmental purpose' such as an 'investigative or administrative function.' . . . If the party acted for an independent reason, the Fourth Amendment is not implicated." State v. Wade McKinley Staggs, Sr., M2007-01228-CCA-R3-CD, 2009 WL 363323, at *7 (Tenn. Crim. App. Feb. 13, 2009) (quoting Burroughs, 926 S.W.2d at 246.). In Staggs, the defendant's son learned from his mother that the Tennessee Bureau of Investigation (TBI) was investigating the defendant; the son went to the defendant's business and saved incriminating images from the defendant's computer on a compact disc. Id. at *3. The defendant's son eventually gave the disc to a TBI agent after the agent contacted him during the course of the investigation. Id. at *4. This court concluded that the son had an investigatory government purpose when he searched the defendant's computer; however, he was not ultimately an agent of the state because the TBI did not know of the search and did not directly or indirectly request that the son obtain images from the defendant's computer. Id.

In the light most favorable to the State, the record supports the trial court's conclusion that Mr. Muenzer was not acting as an agent of law enforcement when he took the Defendant's credit card and identification. Mr. Muenzer received from Belk in Johnson City an email with attached photographs of a person matching the Defendant's appearance; the email warned him about a person who was suspected of credit card fraud who had purchased large gift cards. The day before the incident in this case, Mr. Muenzer was informed that someone matching the given description made a similar purchase at the Knoxville Center Mall Belk; after examining the store's surveillance recording, Mr. Muenzer concluded that it depicted the same person. On the day of the incident in the Turkey Creek Belk, Ms. Lopez responded to the cashier station after a sales associate reported to Mr. Muenzer that a customer was attempting to make a large gift card purchase; as part of the transaction, Ms. Lopez asked for the Defendant's identification and credit card. Mr. Muenzer came to the cashier station and retrieved the cards from Ms. Lopez. Mr. Muenzer told the Defendant that he would need to verify the identification in the security office; the Defendant, in turn, left the store. Upon following the Defendant to the outside door, Mr. Muenzer called Detective Varner.

Mr. Muenzer's hearing testimony indicated that although loss prevention employees had some degree of contact with the retail task force, it was generally limited to an informational meeting during the holiday season and the task force's providing additional officers during that time to respond to increased instances of theft. In addition, the task force and an unidentified number of loss prevention employees from various retailers communicated with one another about suspicious individuals in an email group. Although Mr. Muenzer did not recall how he obtained Detective Varner's direct cell phone number,

–23–

he denied having frequent or personal contact with members of the retail task force. He also denied that Detective Varner or any other officer ever instructed him how to conduct an investigation. The Belk policy manual stated that in cases of suspected credit card fraud, sales associates or store managers should follow procedures set out by the regional loss prevention manager, but it did not specify what those procedures were. In any event, Mr. Muenzer believed that part of his duty as a loss prevention associate was to verify the payment method and identification in such scenarios.

Relative to the first prong of the test, no evidence indicated that law enforcement was aware of or encouraged Mr. Muenzer to confiscate the cards. The record does not reflect that a continuing relationship existed between Mr. Muenzer and the officers of the retail task force such that the officers could be said to have acquiesced or encouraged such a seizure. Cf. Knoll, 16 F.3d at 1319-20; Booker, 728 F.3d at 540-41; Walther, 652 F.2d at 792. In addition, we note that the seizure was complete before the police were informed about the situation. Cf. Lustig, 338 U.S. at 78 (holding that suppression was proper in a federal case when a federal officer arrived after local police began an unconstitutional search and the federal officer participated in examining and selecting evidence relevant to counterfeiting). Mr. Muenzer called Detective Varner after the cards were seized and the Defendant had left Belk. While waiting for Detective Varner to arrive, Mr. Muenzer took it upon himself to call the credit card company and confirm that the card the Defendant presented was forged. Mr. Muenzer denied that he communicated with Detective Varner before Ms. Lopez gave him the Defendant's cards, and Detective Varner did not instruct Mr. Muenzer to seize the cards.

Moreover, relative to the second prong of the test, Mr. Muenzer acted in his capacity as a loss prevention associate for Belk, which included mitigating losses to Belk as a result of external theft. Regardless of any provisions of the Belk policy manual to the contrary, the record reflected that Mr. Muenzer believed it to be his duty to verify a customer's identification and payment method in possible cases of fraud. Mr. Muenzer testified that two days before the incident, he was informed by the Johnson City Belk's loss prevention manager that the Defendant committed credit card fraud in that store. The following day, Mr. Muenzer recognized the Defendant in the surveillance recording at the Knoxville Center Mall Belk, and Mr. Muenzer relayed his concerns to the store manager, who voided the Defendant's gift card purchase. The day after that, Mr. Muenzer was alerted that the Defendant was attempting the same type of purchase at the Turkey Creek Belk. After speaking to the Defendant and obtaining his driver's license and credit card from Ms. Lopez, Mr. Muenzer told the Defendant that he was taking the cards to his office to verify them. The Defendant walked out of the store. Although Mr. Muenzer relayed the situation to the police after the Defendant left the store, at no point did Mr. Muenzer express

–24–

that he was acting at the police's request or that he had been encouraged or instructed by police to handle similar cases in a certain manner.

Therefore, we conclude that Mr. Muenzer had a legitimate independent motivation for seizing the Defendant's identification and credit card and did not implicate the Fourth Amendment in this regard. The Defendant is not entitled to relief on this basis.

### ii.    Traffic Stop

"Individuals do not lose their constitutional protections against unreasonable searches and seizures by getting into an automobile." State v. Smith, 484 S.W.3d 393, 400 (Tenn. 2016). However, if the officer has probable cause or a reasonable suspicion to suspect that a motorist has committed a traffic offense, a traffic stop will "pass constitutional muster." Id. at 400-02. It is well-established that "the duration of an investigative detention," including a traffic stop, "should last no longer than necessary and should generally end when there is no further reason to control the scene or the driver of the vehicle." State v. Donaldson, 380 S.W.3d 86, 93 (Tenn. 2012) (citing Arizona v. Johnson, 555 U.S. 323, 333 (2009)). "The proper inquiry is whether, during the detention, the officer diligently pursued a means of investigation that was likely to confirm or dispel suspicion quickly." State v. Brown, 294 S.W.3d 553, 562 (Tenn. 2009) (citing State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998)). A reasonable traffic stop can become unreasonable "if the time, manner or scope of the investigation exceeds the proper parameters." State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (internal citations omitted).

> The authority for the roadside seizure ends "when tasks tied to the infraction are—or reasonably should have been—completed." Rodriguez v. United States, 575 U.S. 348, 354 (2015). Those tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355. While an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining the individual." Id.

State v. Nicholas Ryan Flood, No. M2019-00525-CCA-R3-CD, 2020 WL 1888905, at *4 (Tenn. Crim. App. Apr. 16, 2020) (emphasis in original removed).

In the light most favorable to the State, the record reflected that Captain Hubbs was informed that Detective Varner had gone to Belk in response to a call from Mr. Muenzer.

–25–

Some minutes later, Captain Hubbs left the station to assist Detective Varner; he saw the Defendant walking briskly to his car and leaving the Belk parking lot. Captain Hubbs indicated that the Defendant matched a description given to police of the person at issue. Captain Hubbs followed the Defendant in his unmarked police cruiser and saw the Defendant run a red light, at which point he initiated the traffic stop.

Although the Defendant argues that the reason for the stop was entirely pretextual, Captain Hubbs testified that he told the Defendant twice that he had stopped the Defendant because he ran a red light. After noting the Defendant's putting his jacket underneath a seat and moving around in the passenger compartment to a suspicious degree, Captain Hubbs gathered the Defendant's driver's license and the rental car agreement, during which interaction the Defendant appeared to be agitated. Captain Hubbs became concerned for his safety and called for backup while he was running the Defendant's driver's license. In the brief period between his call for backup and Officer Strzelecki's arrival, Captain Hubbs discovered no record associated with the Defendant's driver's license. The body camera recording reflects that Captain Hubbs mainly spoke to the Defendant about the red light violation.[12] Moreover, the Defendant admitted to having run the red light. We note that an officer's subjective intent in conducting a traffic stop does not render the stop unconstitutional when probable cause for the stop exists due to a defendant's having committed a traffic violation. See Donaldson, 380 S.W.3d at 92 (citing State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997)).

Further, although the Defendant argues that Captain Hubbs impermissibly extended the traffic stop, the record reflects that upon stopping, Captain Hubbs saw the Defendant put a jacket underneath the passenger's seat of the car. Captain Hubbs stated that the Defendant moved in the passenger compartment to such a degree that Captain Hubbs became concerned for his safety. In addition, when Captain Hubbs approached the front passenger-side window, the Defendant barely opened it and appeared to be nervous or agitated. Captain Hubbs testified that he wanted to wait for backup to arrive before he interacted with the Defendant further. Mr. Muenzer estimated that about fifteen minutes elapsed between the time the Defendant left the store and Detective Varner called him to ask him to come to the location of the traffic stop, although he acknowledged that more time might have passed; Mr. Muenzer was visible in Officer Strzelecki's body camera recording about ten minutes after Officer Strzelecki arrived and began recording.

The record did not reflect that Captain Hubbs impermissibly extended the traffic stop by waiting for backup to arrive. Captain Hubbs was within his rights to request

---

[12] We note that although Officer Strzelecki's questioning indicated that he was primarily investigating the Belk incident, Captain Hubbs initiated the traffic stop. Captain Hubbs's statements in the body camera recording were consistent with his suppression hearing testimony relative to the cause for the stop.

additional support for safety reasons, and while waiting, he continued to perform tasks related to the red light violation, such as checking the Defendant's driver's license.

In any event, reasonable suspicion existed for Captain Hubbs and the other responding officers to expand their investigation beyond that which would have been appropriate for a traffic violation. Captain Hubbs was aware that the Defendant matched the description of a person suspected of credit card fraud in Belk and had seen the Defendant walking in the Belk parking lot so quickly that he was almost jogging. When Captain Hubbs first talked to the Defendant, he was visibly nervous or agitated. "A defendant's nervousness, combined with other suspicious factors, can support an officer's reasonable suspicion of criminal activity so that the officer can expand the scope of a traffic stop to investigate further." State v. Marc K. Eliazar, No. M2017-00757-CCA-R3-CD, 2018 WL 4150879, at *7 (Tenn. Crim. App. Aug. 29, 2018) (citing State v. Eugene Taylor, No. E2010-01817-CCA-R3-CD, 2011 WL 2120087, at *11 (Tenn. Crim. App. May 20, 2011)). Once Detective Varner arrived, she confirmed that the Defendant provided a driver's license to Captain Hubbs that reflected a different name than the one he produced at Belk, which justified further investigation. The body camera recording reflected that after backup arrived, the officers spent about four minutes persuading the Defendant to exit the car, upon which they handcuffed him out of concern for their safety. The Defendant spoke with Captain Hubbs for about one minute, forty-five seconds about the red light violation and the officers' right to search the passenger compartment for weapons; then, Officer Strzelecki asked the Defendant to verify his identity over the course of the next one and one-half minutes. The Defendant declined to answer those questions. Captain Hubbs spoke to the Defendant again for a brief time. After Mr. Muenzer arrived, provided the cards to Detective Varner, and confirmed that the card the Defendant presented reflected a different bank than the one with which the account was associated, probable cause existed to arrest the Defendant. The officers did not impermissibly extend the duration of the traffic stop in this case. The Defendant is not entitled to relief on this basis.

iii.     Search of Car

In the light most favorable to the State, the record reflected that after the Defendant ran the red light, he was agitated when interacting with officers, moved around the passenger compartment, placed items beneath the passenger seat, refused to open his window more than a crack, and stated that he would not exit the car before any officer suggested he do such. After the officers removed the Defendant from the car out of concern for their safety, Mr. Muenzer arrived at the scene and confirmed to Detective Varner that the credit card the Defendant presented at Belk was associated with a different bank than the one displayed on the card. At this point, the officers had probable cause to arrest the Defendant, and it was reasonable to search for additional evidence of credit card

–27–

fraud in the passenger compartment. In addition, the car was parked such that it was blocking traffic turning into one of the shopping complex's driveways; given that no one else was in the car with the Defendant and the rental agreement only contained the Defendant's name, it was reasonable for the car to be impounded and inventoried. Once again, the Defendant is not entitled to relief on this basis.

## II.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions, arguing that no evidence established that he used any of the credit cards at issue. The State responds that in spite of the understanding of the trial court and both parties that the jury was being instructed on fraudulent use of a credit card as a lesser-included offense to identity theft, the jury was, in fact, instructed on the elements of illegal possession of a credit card; the State argues that as a result, the Defendant was properly convicted of illegal possession of a credit card. In a related argument, the State contends that because illegal possession and fraudulent use of a credit card are both Class A misdemeanors and the Defendant has served his sentence, the fact that he was convicted of a different offense than was "perhaps intended" by the parties is moot and should only be addressed by remanding for the entry of corrected judgments reflecting convictions for illegal possession of a credit card.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule

–28–

out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

Notwithstanding the State's characterization of the erroneous jury instruction as a facet of sufficiency of the evidence, they are separate issues implicating different constitutional rights and must be addressed separately. We will discuss the State's argument regarding the jury instructions below.

Relative to sufficiency, as a preliminary matter, we disagree with the State's assertion that this issue is moot due to the Defendant's already having served his sentence. The Defendant is entitled to sufficient evidence underlying the convictions appearing on his criminal record notwithstanding the jail credit he received satisfying his sentence. We also disagree that the jury actually convicted the Defendant of illegal possession of a credit card and that the judgment forms simply contain a clerical error. Although the State cites caselaw addressing constructive amendment of the indictment, this case is distinguishable as it pertains to the incorrect jury instruction because the Defendant did not consent to the jury's being instructed on a different offense than requested. Cf. Demonbreun v. Bell, 226 S.W.3d 321, 326 (Tenn. 2007) (concluding that when defense counsel actively requested a jury instruction on an offense counsel mistakenly believed was a lesser-included offense, the defendant consented to an effective amendment of the indictment). It is clear from the record that the parties and the trial court intended for the jury to consider fraudulent use of a credit card as a lesser-included offense, not illegal possession of a credit card. As we discuss below, were we to accept the State's contention that by instructing the jury on the elements of an offense not requested by the parties, the jury was enabled to properly convict the Defendant of a "perhaps unintended" offense, the Defendant's right to a complete and correct instruction on the relevant law would cease to have meaning.

In relevant part, "[a] person commits the crime of fraudulent use of a credit or debit card who uses . . . a credit or debit card or information from that card, for the purpose of obtaining property, credit, services or anything else of value with knowledge that . . . [t]he card is forged or stolen[.]" Tenn. Code Ann. § 39-14-118. In the light most favorable to the State, the record is devoid of evidence that the Defendant used any of the credit card numbers associated with the specific victims named in Counts 1, 2, and 4 of the indictment.[13]

None of the victims recalled when fraudulent charges were made to their accounts, and the ones who recalled a general issue with account fraud also noted that their accounts had been compromised on various occasions. The portion of the bank records submitted

---

[13] We note that the credit card presented at Belk was not connected to any of the named victims.

to the jury did not indicate whether fraudulent charges were made to the accounts of Mr. Kibler, Mr. Clark, and Axis Autobody.[14]  Because the State failed to prove an essential element of the offense, the evidence was insufficient to support his convictions.

Generally, in a case of insufficient evidence, if the jury was instructed on a lesser-included offense and the proof was sufficient to support a conviction on that offense, we direct the trial court to enter new judgments reflecting a conviction for the lesser offense. In this case, the jury was instructed on attempted theft, and the evidence is sufficient to establish the Defendant's guilt of that offense.   However, we do not intend to convey that attempted theft or fraudulent use of a credit card are lesser-included offenses of identity theft.  See State v. Tehren Carthel Wilson, No. W2010-02613-CCA-R3-CD, 2012 WL 12931582, at *5 (Tenn. Crim. App. May 11, 2012) (concluding that fraudulent use of a credit card was not a lesser-included offense of identity theft under a previous version of the identity theft statute); State v. Ronald Bowman, No. W2003-02389-CCA-R3-CD, 2005 WL 94365, at *4 (Tenn. Crim. App. Jan. 13, 2005) (concluding that misdemeanor theft was not a lesser-included offense of identity theft under previous precedent and a previous version of the identity theft statute).   Nevertheless, neither party has raised an issue on appeal relative to the propriety of the lesser-included offenses, and because the Defendant affirmatively requested that the trial court instruct the jury on both lesser offenses, he consented to an effective amendment of the indictment, and any issue he raised in this regard would be considered waived.   See Demonbreun, 226 S.W.3d at 326; Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").   Therefore, we remand the Defendant's case for entry of new judgments reflecting three convictions for attempted theft.

### III.    Admission of Card Scanner

The Defendant contends that the trial court erred by admitting as exhibits the credit card scanner and the numbers it generated during Officer Hubbs's testimony, arguing that the device was not properly authenticated because the State offered no testimony from an expert witness about how the device functioned; in addition, the Defendant argues that the proof at trial did not establish the card scanner's reliability or accuracy.   The State responds that its demonstration using two credit cards, one of which contained a false

---

[14] The original copies of the bank records were entered for identification only; in compliance with an evidentiary determination by the trial court, the photocopied records submitted as exhibits were redacted to remove Ms. Mioduski's handwritten notations of the respective victims' credit card numbers and whether fraudulent charges were made to the accounts, the victims' social security numbers, and references to unrelated fraudulent charges to Mr. Kibler's account made in March 2017.

number, established that the device operated accurately and that Officer Hubbs's testimony that the machine read and displayed information contained in a credit card's magnetic strip was sufficient explanation of how the device worked.

Rule 901(a) of the Tennessee Rules of Evidence states as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Evidence may be authenticated, in relevant part, through "evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Tenn. R. Evid. 901(b)(9). The Advisory Commission Comments to Rule 901 elaborate that subsection (b)(9) "treats authentication of computer documents. All that the lawyer need do is introduce evidence satisfying the court that the computer system produces accurate information." Authentication issues are left to the discretion of the trial court. State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (citing State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)).

We do not agree with the Defendant that the State failed to provide evidence of the credit card scanner's accuracy. According to the testimony at trial, when Detective Huff swiped the magnetic strip of a credit or debit card through the scanner, the scanner read the data encoded on the magnetic strip and displayed the sixteen-digit card number reflected therein. Detective Huff affirmed that the scanner in evidence was the one he used to verify the data produced by the credit cards confiscated from the Defendant. Detective Huff demonstrated the machine's functionality for the trial court and the jury by scanning one of the Defendant's legitimate credit cards, which reflected that the embossed and encoded numbers matched, and one of the forged credit cards, which showed that the embossed number did not match the number produced by the scanner. Given the demonstrative exhibit, Detective Huff's confirmation that this was the machine he used, and his assertion that to his knowledge, the machine did not need calibration, the State provided the trial court sufficient information for it to be satisfied that the device produced accurate results. The trial court did not abuse its discretion by admitting the scanner and the card numbers it produced.

Additionally, Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tennessee Rule of Evidence 703 provides that

> the facts or data in the particular case upon which an expert bases an opinion
> or inference may be those perceived by or make known to the expert at or

before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Relative to the Defendant's contention that it was necessary to have an expert witness explain the inner workings of the card scanner to prove its accuracy, we note that the Defendant cites to cases involving breathalyzers and the horizontal gaze nystagmus (HGN) test. Relative to the former, in State v. Sensing, 843 S.W.2d 412 (Tenn. 1992), our supreme court developed procedures to admit breathalyzer test results in light of their widespread use by patrol officers and the standardized nature of the devices; we do not think that the reasoning underlying Sensing applies to evidence obtained from credit card scanners, and we will not extend Sensing's procedural requirements to this case.

Relative to the latter, we find it informative to examine State v. Murphy, 953 S.W.2d 200, 202-03 (Tenn. 1997), in which our supreme court compared the HGN test with other field sobriety tests and held that in order to admit results of an HGN test, it was necessary for an expert witness to testify. In Murphy, our supreme court explained that when assessing testimony about certain field sobriety tests like walking on a line, standing on one foot, or counting backwards, a juror could readily ascertain why the results were relevant to assessing a defendant's condition because he or she could "rely upon his or her personal experience or otherwise obtained knowledge of the effects of alcohol upon one's motor and mental skills to evaluate and weigh the officer's testimony." Id. at 203. In contrast, to present an officer's observations about a defendant's performance during an HGN test, "the witness must necessarily explain the underlying scientific basis of the test in order for the testimony to be meaningful to a jury . . . . In effect, the juror must rely upon the specialized knowledge of the testifying witness and likely has no independent knowledge with which to evaluate the witness's testimony." Id. Our supreme court also noted that the HGN test involved measurement of the angle at which nystagmus occurred and that the accuracy of an officer's testimony in this regard "may be questionable in light of the officer's non-scientific measurement of a scientifically measurable phenomenon." Id.

In this case, the credit card scanner used by the police was described as a machine that read the number electronically encoded on a credit card and displayed the number on a screen. Credit and debit cards are sufficiently ubiquitous in our society that jurors can use their experience and knowledge to analogize the card scanner to other devices with which they are familiar—for example, a credit card terminal at a grocery store, bank, gas station, convenience store, or retail establishment—and are likely to be familiar with the concept of such a machine's reading the number of the card.

The trial court did not abuse its discretion by determining that Detective Huff was competent to offer testimony about the card scanner's functionality and that the demonstrative exhibit was satisfactory proof of the machine's accuracy. Likewise, the court did not abuse its discretion by determining that expert testimony was unneeded to substantially assist the jury in understanding what results the scanner produced or how the scanner's readings were relevant to the case. The Defendant is not entitled to relief on this basis.

## IV. Jury Instructions

The Defendant contends that the trial court erred by instructing the jury on the elements of illegal possession of a credit card rather than the intended lesser-included offense of fraudulent use of a credit card. The Defendant acknowledges that no contemporaneous objection was made and requests plain error review.

The State's appellate brief does not directly respond to this issue, but rather characterizes the error as one involving the sufficiency of the evidence, arguing that the Defendant has waived any issue related to the jury instructions because his written request was "ambiguous" and he did not preserve the issue for plenary review; the State notes that the written request contained language for both fraudulent use and illegal possession of a credit card. Alternatively, the State argues that the Defendant consented to an effective amendment of the indictment by requesting jury instructions on fraudulent use of a credit card and attempted theft.

The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231. Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." State v. Martin, 505 S.W.3d 492, 505 (Tenn. 2016).

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)). An instruction results in prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

The trial court discussed the proposed jury instructions during multiple trial recesses and gave the parties ample opportunity to discuss the proposed instructions and make objections. The Defendant requested that the jury be instructed on fraudulent use of a credit card as a lesser-included offense, as well as attempted theft. The trial court and the parties discussed fraudulent use of a credit card, not illegal possession of a credit card, as the first lesser-included offense. The Defendant's written request for jury instructions included sections titled, "Request #1: Attempted theft," and "Request #2: Fraudulent use of a credit card"; the document contained the full Tennessee Pattern Jury Instruction for both lesser-included offenses. In relevant part, Pattern Jury Instruction 11.18 was listed as follows:

> Any person who [illegally possesses][fraudulently uses] a credit or debit card is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> [Part A:
>
> (1) that the defendant took, exercised control over or otherwise used a credit or debit card or information from such card;
>
> and
>
> (2) that the defendant acted without the consent of the owner or issuer;
>
> and
>
> (3) that the defendant acted knowingly.]

–34–

or

[Part B:

(1) that the defendant used or allowed to be used a credit or debit card or information from such card;

and

(2) that the defendant's purpose was to obtain property, credit, services or anything else of value;

and

(3) that the defendant had knowledge that:

(a) the card was forged or stolen;

or

(b) the card had been revoked or canceled;

or

(c) the card had expired and the person used the card with fraudulent intent;

or

(d) for any other reason the use of the card was unauthorized by the issuer or the person to whom such card was issued.]

As set forth above, the jury was instructed that if it found the Defendant not guilty of identity theft, it should consider whether the Defendant was guilty of "fraudulent use of a credit card." However, the jury then heard the elements for illegal possession of a credit card. The jury's verdict forms indicated that it found the Defendant guilty of "fraudulent use of a credit card" relative to Mr. Kibler, Mr. Clark, and Axis Autobody.

As a preliminary matter, the State's argument relative to ambiguity in the written instruction request is not well-taken. The record is clear that fraudulent use of a credit card was the requested lesser-included offense and that the trial court and the parties shared this understanding. Moreover, the pattern jury instruction makes clear that the court was

meant to choose between the options delineated in brackets. The discrepancy in the jury instructions was a mistake that escaped the notice of the trial court and the parties, not a valid interpretation of an ambiguous request.

The Defendant draws our attention to a panel of this court's opinion in State v. Walkington, No. M2019-01772-CCA-R3-CD, 2020 WL 6791248, at *7 (Tenn. Crim. App. Nov. 19, 2020), in which this court reversed the defendant's conviction for child abuse for insufficient evidence and noted that reversible error also occurred in the jury instructions. In Walkington, the defendant was charged with aggravated sexual battery, and the trial court intended to instruct the jury on child abuse as a lesser-included offense. Id. Although the trial court issued an instruction purporting to contain the elements of child abuse, the elements set forth were, in fact, those for child neglect. Id.

We agree with the Defendant that the procedural facts of his case are analogous to those in Walkington; although the Defendant requested an instruction on fraudulent use of a credit card as a lesser-included offense, the elements given to the jury were those for illegal possession of a credit card. Because the instruction on the offense of conviction contained the incorrect elements, we conclude that a clear and unequivocal rule of law was breached. No tactical reason existed to waive the error, and the Defendant's substantial right to a correct and complete charge of the law was affected. Because the Defendant was convicted of the lesser-included offense (as improperly instructed) and the evidence was insufficient to support a conviction when applying the correct elements for fraudulent use of a credit card, we conclude that consideration of the error is necessary to do substantial justice and that plain error relief is warranted.

We will, therefore, remand this case for the entry of amended judgments reflecting three convictions for attempted theft of property, the remaining lesser-included offense. Moreover, because the State identified no value for the objects of the attempted thefts, the judgments should classify each conviction as a Class B misdemeanor. See State v. Tyrone Ralph Wright, No. M2010-02096-CCA-R3-CD, 2012 WL 601332, at *14 (Tenn. Crim. App. Feb. 23, 2012) (concluding in a case involving stolen checks that "[w]hile this [c]ourt may not presume the range of value of an item, we can assume that the checks, as a means for an account holder to access funds, has a monetary value over zero" and classifying the offense as a Class A misdemeanor); State v. Jarvis Loverson, No. W1999-01750-CCA-R3-CD, 2000 WL 1664276, at *3 (Tenn. Crim. App. Oct. 23, 2000) (reducing offense classification for attempted theft of property to Class B misdemeanor when the State offered no evidence of the property's value); Tenn. Code Ann. §§ 39-12-107(a), -14-105(a)(1) (criminal attempt of an offense is one class lower than the completed offense; theft of property valued at $1,000 or less is a Class A misdemeanor).

Relative to sentencing, no hearing was held in this case because the parties agreed upon maximum length, concurrent sentences for the Class A misdemeanor convictions after the jury announced its verdict. We acknowledge that the agreement was reached because the Defendant had served two years in jail at the time of his convictions in this case; by extension, any new sentence imposed for attempted theft, a Class B felony, will already have been served. See Tenn. Code Ann. § 40-35-111(e)(2) (setting maximum Class B misdemeanor sentence at six months in confinement). Although the trial court made no findings of fact regarding sentencing, because any issue regarding the effective length of the Defendant's sentence is moot, in the interests of judicial economy, we will adopt the parties' logic at trial and impose maximum concurrent sentences of six months for each attempted theft conviction.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed and the case remanded for the entry of amended judgments reflecting three convictions for attempted theft and six-month, concurrent sentences.

_____
D. KELLY THOMAS, JR., JUDGE